United States Courts
Southern District of Texas
FILED

FEB 0 4 2002

Michael N. Milby, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

# H-02 -0410

| | |
|---|---|
| PIRELLI ARMSTRONG TIRE CORPORATION RETIREE MEDICAL BENEFITS TRUST, On Behalf of Itself and All Others Similarly Situated, § | Civil Action No. |
| | |
| Plaintiff, § | CLASS ACTION |
| | |
| vs. § | |
| | |
| HANOVER COMPRESSOR COMPANY, MICHAEL J. MCGHAN, WILLIAM S. GOLDBERG and MICHAEL A. O'CONNOR, § | |
| | |
| Defendants. § | DEMAND FOR JURY TRIAL |

**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

## INTRODUCTION AND OVERVIEW

1.      This is a securities class action on behalf of all persons who purchased the publicly traded securities of Hanover Compressor Company ("Hanover" or the "Company") between November 8, 2000 and January 28, 2002 (the "Class Period").  Plaintiff alleges violations of the federal securities laws arising out of defendants' issuance of false financial statements and other false and misleading statements about the Company's operating performance.

## JURISDICTION AND VENUE

2.      The claims asserted arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t, and Rule 10b-5.  Jurisdiction exists pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.  Certain of the Individual Defendants are residents and citizens of this District, including defendants McGhan and Goldberg. Hanover is a citizen of Texas, as it is a corporation with its principal place of business in Houston, Texas.

3.      Hanover conducts business in and maintains operations in this County.  Defendants' wrongful conduct took place in this District, including dissemination of many of the false and misleading statements made by defendants in and from this County.  For example, the false releases and Securities and Exchange Commission ("SEC") filings complained of herein were prepared and disseminated from this County.

## THE PARTIES

4.      Plaintiff Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust purchased shares of Hanover during the Class Period (as reflected in the attached Certification) and was damaged thereby.

5.      Defendant Hanover began operating in 1990 and is headquartered in Houston, Texas. Hanover is a provider of natural gas compression, gas handling and related services in the United States and select international markets.

6.      (a)      Defendant Michael J. McGhan ("McGhan") was at all relevant times the President and CEO of Hanover.  Because of his position, McGhan knew the adverse non-public information about Hanover's business, as well as its finances, markets and present and future

00036319

business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings or committees thereof, and via reports and other information provided to him in connection therewith. During the Class Period, McGhan participated in the issuance of false and/or misleading statements.

        (b)      Defendant William S. Goldberg ("Goldberg") was the Executive Vice President and CFO of Hanover. Goldberg is also the managing director of GKH Partners, L.P., the General Partner of GKH Investments, L.P. (collectively, "GKH"). Because of his position, Goldberg knew the adverse, non-public information about Hanover's business, as well as its finances and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management or Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the Class Period, Goldberg participated in the issuance of false and/or misleading statements. Goldberg took advantage of the defendants' false statements, selling at least 4.9 million shares of Hanover stock during the Class Period at a price of $35.15 per share, for proceeds of approximately $172 million. These sales were for shares owned by GKH, which is controlled by him.

        (c)      Defendant Michael A. O'Connor ("O'Connor") was at all relevant times the Chairman of Hanover. Because of his position, O'Connor knew the adverse, non-public information about Hanover's business, as well as its finances and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at Board of Directors and/or management meetings, and via reports and other information provided to him in connection therewith. During the Class Period, O'Connor participated in the issuance of false and/or misleading statements. O'Connor took

advantage of the defendants' false statements, selling at least 150,000 shares of Hanover stock during the Class Period at a price of $35.15 per share, for total proceeds of more than $5.2 million.

(d)     The defendants identified in ¶6(a)-(c) are referred to herein as the "Individual Defendants."

## KNOWLEDGE, GROUP-PUBLISHED DOCUMENTS, AND DUTY TO DISCLOSE OR ABSTAIN FROM STOCK SALES

7.     During the Class Period, each of the Individual Defendants occupied a position as one of the top three Hanover executives and was privy to non-public information concerning the Company. Each of them knew of the adverse facts specified herein. Notwithstanding their duty to refrain from causing Hanover to sell/dispose of stock or other securities while in possession of material, adverse, non-public information concerning the Company, these defendants caused Hanover to sell (issue) millions of shares of Hanover stock at grossly inflated prices, thus allowing the Individual Defendants and Hanover to benefit from the defendants' wrongful course of conduct. Hanover completed a secondary share offering that closed on March 16, 2001 at a price of $35.15. In that offering, insiders sold 7.5 million shares and the Company sold 2.5 million. In addition, during the Class Period the Company sold $170 million of convertible senior notes at a conversion price of $43.94. Hanover's press releases, corporate reports to shareholders, and filings with the SEC were each group-published documents for which each defendant is equally responsible.

8.     Each of the Individual Defendants and Hanover is liable for making false and misleading statements in that they inflated the price of Hanover stock by making false and misleading statements and omitting material adverse information. The defendants' wrongful course of business (i) artificially inflated the price of Hanover's stock during the Class Period; (ii) deceived the investing public, including plaintiff and other Class members, into acquiring Hanover's securities at artificially inflated prices; (iii) allowed the Individual Defendants to sell more than $177 million worth of the shares held/controlled by them and allowed the Company to sell 2.5 million shares of its own stock together with a simultaneous $170 million convertible note offering; (iv) complete the acquisition of Schlumberger Ltd.'s natural gas business using $283 million of its own stock; and (v) permitted Hanover to grow and benefit economically from the wrongful course of conduct.

9.     Hanover and its top officers inflated the price of the Company's stock in order to pursue an accelerated securities sale program. Defendants knew that concealing Hanover's Hampton Roads joint venture and the true impact it would have on the Company provided the only way that they could foster the perception in the business community that Hanover was a "growth company," *i.e.,* the only way Hanover could post the revenue and earnings per share ("EPS") growth claimed by defendants.

## BACKGROUND AND OVERVIEW

10.     Hanover's September 30, 2000 10-Q mentions several transactions. However, it conceals one transaction that actually took place in September, but was not reported in September. This deal was a 25% investment in a limited partnership called "Hampton Roads."[1] Hampton Roads is a joint venture whose purported purpose was to build and operate a facility in Nigeria. Hanover agreed to invest $1.25 million into the deal.

11.     However, the "real" purpose of Hampton Roads was to provide a meaningful boost to Hanover's reported earnings in the September and December 2000 quarters and beyond. Potentially, the deal was worth $51 million in revenue to Hanover. That is a material amount of revenue and would generate significant earnings. Defendants' goal was for all of the revenue to have been recognized by Hanover before the end of Q3 01, but they needed to recognize a material amount in Q3 00 and Q4 00.

12.     The reason that the Q3 00 and Q4 00 quarters are so important is that Hanover completed a secondary share offering that closed on March 16, 2001, at price of $35.15. In that offering insiders sold 7.5 million shares and the Company sold 2.5 million. In addition the Company sold $170 million of convertible senior notes at a conversion price of $43.94.

**The Sham Transaction**

13.     In March 1998, a Nigerian company, GERL, entered into an agreement with Shell to buy gas from Shell in Nigeria. GERL was obligated as part of the deal to build and operate a gas processing plant on three barges to be located near Cawthorne Channel in Nigeria. In July 1999,

---

[1] The first and only mention of this deal that we can find in the public filings of Hanover is in the Fiscal 2000 10-K that was issued on *April 2, 2001*.

00036319

Hanover entered into an agreement with GERL to build the barges. In April 2000, a Houston energy broker, who is now an employee of Hanover, approached a local wealthy individual with a business proposition. The investor could receive at least a guaranteed 20% return on his investment for 10 years.

14.     Defendants worked at completing the deal in the summer of 2000, but toward the end of Q3 00, the defendants were scrambling to obtain signatures of all the relevant parties by September 30, 2000, so that their scheme to inflate the Company's results and complete the share and convertible note sales could succeed. The documents consisted of a *partnership member agreement, a turnkey construction agreement with Hanover Maintech, a security agreement, a financing statement, and a guarantee of refund by Hanover*.

15.     The potential investor in Hampton Roads was advised to record the transaction in the Company's Q3 00, as the deal needed to be done by September 30, 2000, so that defendants could book revenue. In fact, it appears that the need to finish the deal was so urgent that Hanover agreed to pay the investor an additional inducement of a $1 million commission if the deal got done promptly. In addition, Hanover also gave the investor a *side letter* saying that it would loan up to approximately $40 million to the joint venture in the event the joint venture could not line up the additional financing necessary to pay the partnership's obligations to Hanover Maintech.

16.     The deal was signed on the weekend of September 30, 2000. The investor was to own 75% of the Hampton Roads joint venture, and Hanover 25%. Hanover agreed to pay the investor a $1 million fee to close the deal. The partnership provided a "Notice to Proceed" to the contractor, Hanover Maintech, on September 30, 2000.

**Terms of the Sham Transaction**

17.     Hanover would build and operate a natural gas processing plant built on three barges that would be operational in Nigeria by August 2001. Hanover represented that the partnership would enter into a lease agreement which would provide to the partnership $1.1 million per month for a ten-year period, which was to be split 25% to Hanover and 75% to the investor, and at the end of the lease the barges were expected to be sold for $51 million or more, with the split again 25%/75%, except that over $60 million the split was 50%/50%. The investor expected to receive

00036319

pre-tax net income of about $550,000 from this deal every month for a ten-year period after the barge was put into production.  Hanover agreed to arrange to guarantee these payments.  Thus, the investor expected a pre-tax return of $66 million over a 10-year period, guaranteed, on a net investment of $2.75 million plus some expenses.  In addition, he would receive proceeds from the sale of the barges at the end of the 10-year lease.  This sounds as if it was too good to be true, and indeed it did not happen.

18.     Simultaneously with the partnership deal being signed on September 30, 2000, the partnership executed a "***Turnkey Construction Agreement***" with Hanover Maintech, which said that it was giving Hanover a $51 million order to construct and install the barges by August 31, 2001.  The first payment, $5 million, was to be made in 30 days, and the balance to be paid later.  The partnership agreed to give Hanover a $43.5 million promissory note to guarantee its obligations to Hanover.  Hanover guaranteed Maintech's performance to the partnership.

19.     Also on September 30, 2000, Hanover issued a loan commitment letter to the partnership which constituted

> Hanover's commitment to loan funds to Hampton ... for the purpose of paying Hanover Maintech....  The balance of the purchase price as evidenced by a certain Promissory Note to be executed by Hampton ... upon acceptance of the plant/barges as provided for in the Turnkey Construction Contract ... not to exceed $43,500,000 ...

in the event that Hampton could not itself line up the financing.

20.     Also on September 30, 2000, Hanover Maintech issued a letter agreeing to pay a $1 million commission on the Turnkey deal to Hampton Roads or to a designated nominee of Hampton.  This payment was due within 10 days after Hampton made the $5 million down payment to Hanover Maintech.

21.     On November 6, 2000, Hanover issued a "Guarantee of Refund" to Hampton.  The guarantee of refund notes that Global Leasing entered into a charter for the barges to be provided by Hampton.  Global Leasing was supposed to provide a performance guarantee with respect to its lease obligations acceptable to Hampton by September 1, 2001.  In connection with Global's obligation, Travelers of Hartford had issued on October 27, 2000, a conditional letter of commitment to issue the guarantee by September 1, 2001.  However, if the conditions in the conditional letter were not

00036319

met, then Travelers would not issue the performance guarantee. The Guarantee of Refund from Hanover to Hampton provided that if the preconditions were not met and the guarantee was not issued by Travelers, then Hanover would refund to Hampton any payments and expenses that had been incurred in relation to the transaction with Hanover Maintech and that Hampton would be released from all its obligations to Hanover Maintech. The guarantee to Hampton provided that if the performance bond had not been posted guaranteeing the lease deal by February 6, 2001, that Hampton could demand and receive its money back from Hanover Maintech.

22.      In December 2000, the investor in Hampton learned of problems with the deal in Nigeria. Hanover told the investor that Shell Nigeria, which was to provide the feedstock to the natural gas plant in Nigeria which would be making the lease payments to Hampton, was claiming that it could not provide the amount of gas necessary to support the size of the project. The investor flew to Nigeria, where the president of Shell Nigeria told him that the critical pipeline that was necessary to provide gas feedstock to the plant would not be in place until between October 2003 and October 2004. Moreover, according to the investor, he was told that October 2003 to October 2004 had always been the completion date, *and that defendants had been aware of this*. He further told the investor that Shell Nigeria was in a formal arbitration in London with Hanover and Global Nigeria about the size of the plant.

23.      On February 5, 2001, when the deadline for providing the surety bond arrived and no bond had been produced, the investor decided to ask for his money back under the refund agreement. *A letter requesting the refund was sent to Hanover on February 6, 2001.*

24.      *Hanover delayed the refund of the money until March 19, 2001, three days after Hanover and Hanover insiders sold 10 million shares to the public and the convertible bond offering had been priced.*

25.      *Hanover did deliver a refund of $4 million pursuant to the guarantee of refund agreement on March 19, 2001. However, the method that it chose to deliver the funds was curious indeed. Hanover told the investor that it would not refund the money directly to the investor. Instead, it wanted to refund the money to another company related to the investor. On March 19, 2001, Hanover refunded the $4 million to a related entity of the investor, and in return*

00036319

*the investor's affiliated entity issued a promissory note to Hanover for $4 million, payable by May 18, 2001.*

26.     Of course, the note was never repaid and Hanover never made a demand that the note be repaid. Instead, on August 7, 2001, the note was canceled. At the same time, on August 7, 2001, Hanover issued a letter to the investor's attorney that asked for an agreement from the investor that acknowledged that when Hanover made the $4 million loan to the investor's affiliated entity that the entity was acting as a nominee for Hampton, and it was understood that the funds were to be treated as a repurchase of the investor's membership interest in Hampton Roads. The language reads: "*notwithstanding the documentation*," and "*as such represents a return of capital*." Also on August 7, 2001, the investor agreed to relinquish his interest in the partnership, but retained his rights respecting costs and expenses and claims owed him under the original agreement. It would not be until January 2002 that the truth concerning the Hampton Roads transaction would ever *begin* to emerge. As the truth began to trickle into the market, followed by the Company's admission on January 28, 2002 that it had booked millions in revenue/EPS associated with its dubious Hampton Roads project, Hanover's shares had plummeted to below $15.00 per share.

## FALSE AND MISLEADING STATEMENTS

27.     On November 8, 2000, the Company issued a press release entitled, "Hanover Compressor Reports Record Third Quarter Driven by Strong Growth Across All Business Segments; Year-Over-Year Quarterly Net Income Increases 48%; Year-Over-Year Quarterly Cash Flow Increases 60%." The press release stated in part:

> Hanover Compressor Company, a leading provider of outsourced natural gas compression services, today reported continued strong growth in revenue, cash flow and net income for the third quarter ended September 30, 2000.
>
> Total revenue for the third quarter 2000 was $162.6 million, representing an 86 percent increase over total revenue for the quarter ended September 30, 1999 of $87.3 million. Cash flow (income before income taxes, interest expense, leasing expense, distributions on mandatorily redeemable convertible preferred securities and depreciation and amortization) increased 60 percent in the third quarter of 2000 to $55.2 million or $0.77 per fully diluted share. Year earlier cash flow was $34.5 million or $0.56 per fully diluted share. Net income grew 48 percent to $15.4 million or $0.23 per fully diluted share, compared with $10.4 million or $0.17 per fully diluted share for the third quarter of 1999.

00036319

Total revenues for the nine-month period ended September 30, 2000 were $370.2 million, compared with $227.8 million for the first nine months of 1999, an increase of 63 percent. Cash flow increased 47 percent to $139.4 million or $2.16 per fully diluted share, compared with cash flow of $94.8 million or $1.55 per fully diluted share. Net income grew 43 percent to $39.3 million or $0.61 per fully diluted share, compared with $27.5 million or $0.45 per fully diluted share for the nine months ended September 30, 1999. Per share results have been adjusted to reflect the 2-for-1 stock split of outstanding shares on June 13, 2000.

"Hanover's very strong growth in revenues, cash flow and earnings reflect the Company's outstanding execution of our five-part growth strategy as well as the continued industry-wide growth in outsourcing in this highly favorable operating environment," said Michael J. McGhan, president and chief executive officer. "Our company has continued to make substantial gains in the core compression and gas handling business through strong organic growth as well as the successful integration of Hanover's recent major acquisitions, PAMCO Services International and Dresser-Rand's Compression Services Division. At the same time, Hanover has very successfully expanded into related product and service markets such as outsourced gas treating, compression maintenance and gas measurement, among others, expanding Hanover's market reach and increasing its return on capital. Through these moves we are able to offer the broadest set of compression and gas handling solutions, adding more value to our customers and assisting them to achieve their own performance and growth goals," McGhan added.

Compression rental revenue for the quarter ended September 30, 2000, increased 33 percent to $66.3 million, compared with $50.0 million for the third quarter of 1999. Total compression horsepower was 2,098,000 at September 30 and fleet horsepower utilization averaged 93 percent during the quarter. This statistic includes the impact of Hanover's acquisition of PAMCO Services International and Dresser-Rand's Compression Services Division in July and August, respectively, whose combined fleet aggregates 375,000 horsepower and is presently operating at 85 percent horsepower utilization, compared with 76 percent at the time of those acquisitions. Hanover's parts, service and used equipment segment continued to experience the fastest rate of growth among Hanover's businesses, with total revenue of $28.7 million, up 132 percent from the same period a year earlier. Third quarter compressor fabrication revenues increased 88 percent to $31.0 million, reflecting an increase in both compression horsepower packaged as well as unit sales to third party customers. Production and processing equipment fabrication revenue was $32.8 million, up 324 percent from the year earlier period, reflecting both the strengthening of Hanover's oil and gas production equipment business and the contribution of the T.H. Russell Co. and Maloney Industries units of Applied Process Solutions, Inc., acquired by Hanover on June 5, 2000.

*"Looking ahead, management sees continued significant growth due to the increasing outsourcing trend among our rapidly expanding customer base, Hanover's continued expansion of new and highly-related business lines and further improvements in the performance of recently acquired companies," McGhan said. "Hanover's solid performance to date confirms our view that a period of accelerated growth in the compression and gas handling industries is underway. The current outlook for our industry is very favorable and Hanover, the market leader, is expanding its lead. Steady growth in demand has resulted in industry-wide improvement in fleet utilization as the outsourcing trend intensifies. Hanover's strategies, organization and growth drivers are in place and the activity level throughout our company is very high, contributing to our very strong outlook."*

00036319

28. On March 9, 2001, the Company issued a press release entitled, "Hanover Compressor Reports Record Results; Anticipates "Strong" Growth in 2001; 4th Quarter Cash Flow and Diluted Earnings Per Share Increase 80 Percent and 29 Percent, Respectively; Fully Diluted 4Q00 EPS $0.27 vs. $0.21." The press release stated in part:

> Hanover Compressor Company, a leading provider of outsourced natural gas compression services, today reported record revenues, cash flow and earnings per common share for both the fourth quarter and year ended December 31, 2000, continuing the Company's strong growth record.
>
> "We are very pleased with Hanover Compressor's 45 percent growth in net income and 57 percent growth in cash flow during 2000, supported by the continued strength of the compression outsourcing segment, the very favorable operating environment for the energy industry, and the success in several recent acquisitions," said Michael J. McGhan, President and Chief Executive Officer. "We also were highly successful in growing our geographic presence both domestically and overseas, and in expanding our product line, thereby extending Hanover's industry leadership position.
>
> "We continue to maintain our lead in the compression services business, and we have confidence in Hanover's strong growth in the years ahead. Hanover's leadership in compression enables our company to offer customers a total solution to their gas handling needs by extending our successful outsourcing model from compression to gas treating, process measurement and power generation. I'm pleased to report we are experiencing strength in all aspects of our outsourcing business in the U.S. and dynamic international markets. The genuine value we deliver to our customers drives the outstanding growth Hanover is experiencing. These factors, together with the success of recent acquisitions and other successful growth initiatives, drive our belief that Hanover will deliver strong growth in 2001."
>
> For the fourth quarter of 2000, total revenues increased 145 percent to $233.6 million from $95.4 million in the year-earlier period. Net income rose 50 percent to $19.4 million from $12.9 million. Diluted earnings per common share increased 29 percent to $0.27 from $0.21. For the full year 2000, total revenues increased 87 percent to $603.8 million from $323.2 million in the prior year. Net income rose 45 percent to $58.7 million from $40.4 million. Diluted earnings per common share increased 33 percent to $0.88 from $0.66.
>
> For the fourth quarter of 2000, the Company's cash flow (income before income taxes, interest expense, leasing expense, distributions on mandatorily redeemable convertible preferred securities and depreciation and amortization) increased 80 percent to $67.3 million from $37.3 million in the year-earlier period. For fiscal 2000, the same measure increased 57 percent to $206.7 million from $132.1 million.
>
> Hanover's record performance in 2000 was driven by its core compression rentals segment, which generated over 81 percent of the Company's consolidated cash flow. Compression rental revenues increased 35 percent from quarter to quarter and 32 percent year to year. Related compression parts and service segment revenues were up 478 percent quarter to quarter and 257 percent year to year as a result of increased marketing focus and expansion of business activities through recent

acquisitions.  Compressor fabrication revenues increased 115 percent quarter to quarter and 84 percent year to year.

Production and processing equipment fabrication increased 406 percent quarter to quarter and 216 percent year to year.  Strong growth during 2001 is anticipated as the Company's diversified customer base increasingly fills its compression services requirements through outsourcing compression and accelerates its purchases of equipment in concert with expanding production budgets.

Rental fleet compression, including the acquisition of OEC Compression scheduled to close this month, totals 2.4 million horsepower, an increase of 65 percent over 1999, reflecting the impact of both acquisitions and continued organic growth in customer demand for outsourcing compression.

*Looking ahead, McGhan remarked, "Hanover's solid growth confirms our view that a period of strong growth in the compression and gas handling industries is underway. Our confidence is supported by the robust business environment that our customers and we are now experiencing. Hanover has delivered significant growth during all phases of the commodity price cycle, and the present exceptional business environment is extremely encouraging.  Hanover's strategies, organization and growth drivers are in place and the activity level throughout our company is strong, thereby contributing to Hanover's strong outlook.  This future growth will be the product not only of sound acquisitions, but also due to the strong internal growth Hanover sees as customers continue to outsource more and more of the gas compression and treatment process to total solution providers*."

29.      On March 16, 2001, the Company issued a press release entitled, "Hanover Compressor Company Announces Pricing of Public Offering."  The press release stated in part:

Hanover Compressor Company today announced the public offering of 10 million shares of common stock and $170 million convertible senior notes.

The initial public offering price will be $35.15 for 10 million shares of its common stock, 2.5 million of which are offered by Hanover and 7.5 million shares of which are offered by selling stockholders.

Hanover also will issue $170 million aggregate principal amount of 4.75% Convertible Senior Notes due 2008.  The notes will mature on March 15, 2008 and are first subject to call on March 15, 2004.  The notes will be convertible into shares of Hanover Compressor Company common stock at a conversion price of approximately $43.94 per share.

30.      On April 2, 2001, the Company filed its 10-K, which stated in part:

*The Company has no commitments or contingent liabilities which, in the judgment of management, would result in losses that would materially affect the Company's consolidated financial position, operating results or cash flows.*

31.      On May 9, 2001, the Company issued a press release entitled, "Hanover Compressor Reports Record Revenue and Cash Flow for 1st Quarter; Year-Over-Year Cash Flow Increases 78%; Fully Diluted 1Q01 EPS $0.26 vs. $0.18."  The press release stated in part:

Hanover Compressor Company, a leading provider of outsourced natural gas compression services, today reported revenues increased 143 percent and cash flow increased 78 percent for the first quarter ended March 31, 2001, compared with the same quarter a year earlier.

"Across the board, Hanover's operations turned in a very solid performance in the first quarter, reflecting growth across all product lines, outstanding field operations and the continued success of the corporate acquisitions we completed during the second half of last year," said Michael J. McGhan, President and Chief Executive Officer. "Our results display strong organic growth in our outsourcing businesses which now includes compression, gas treating, process measurement and power generation."

"The trend toward outsourcing continues to be strong among natural gas producers, both domestically and overseas," McGhan said. "Hanover's compressor fleet utilization and efficiency are running at a very high rate as our Company performs at the highest level for our expanding customer base. Barring fundamental changes in the energy sector, we anticipate continued strong growth throughout the year."

First quarter total revenues increased 143% to $219.8 million from $90.6 million for the quarter ended March 31, 2000. Cash flow (income before income taxes, interest expense, leasing expense, distributions on mandatorily redeemable convertible preferred securities and depreciation and amortization) increased 78% to $69.8 million from $39.2 million for the same quarter a year ago. First quarter net income of $18.6 million was 66% higher than the year earlier level of $11.2 million. Diluted earnings per common share were $0.26, a 44% increase over $0.18 per fully diluted share a year ago. Diluted earnings per share for the quarter were reduced by $0.02 as a result of non-cash charge attributable to the Company's implementation of Financial Accounting Standards Board (FASB) Statement 133, Accounting for Derivatives, relating to an interest rate swap held by the Company.

32. On August 9, 2001, the Company issued a press release entitled, "Hanover Compressor Reports Record Revenues, EBITDA and Net Income for Second Quarter 2001; Year-Over-Year Quarterly Cash Flow Increases 72%." The press release stated in part:

Hanover Compressor, a leading provider of outsourced natural gas compression and treating services, today reported revenues increased 124.7 percent and cash flow increased by 71.6 percent for the second quarter ended June 30, 2001, compared with the same quarter a year earlier. Net income for the quarter increased 83.2 percent over the prior year period.

The company also reported that its planned acquisition of Schlumberger's Production Operators Corporation natural gas compression business and other related interests for $761 million is proceeding on schedule and is expected to close by the end of the month.

"This second quarter of 2001 marked a milestone in the 11-year history of Hanover Compressor," said Michael J. McGhan, President and Chief Operating Officer. "Each of our business segments achieved outstanding performance as we significantly increased our global presence and overall market position through internally generated growth and Hanover's continued significant improvement of recently acquired operations. This level of accomplishment has Hanover very well

prepared for the addition of Schlumberger's Production Operators (POI) gas compression unit, South American joint ventures, and related assets. This transaction, which is accretive from the onset and is scheduled to close at the end of the month, will also launch a worldwide alliance between Schlumberger and Hanover and will result in Schlumberger becoming a major shareholder in Hanover for at least three years. POI's organization and customer base is first rate and we are very excited about this outstanding group becoming part of the Hanover family."

* * *

"Our accelerating progress in recent years is proof of the resounding strength and added value of our outsourcing model. Demand for both primary and outsourced gas compression and related gas handling services continues to grow, especially overseas," McGhan said. "Our business is very much about providing our customers here and abroad a total solution of products and services – bundling compression, parts and service, gas processing, treating and measurement, power generation and pump systems – to help them improve their business results. *We are very excited about our growth opportunities over the next five years and beyond*."

Overall growth among Hanover's core business segments was strongly compared with the second quarter a year ago, reflecting the impact of the Company's growth strategy as well as the successful integration of several recent corporate acquisitions.

33.     On September 4, 2001, the Company issued a press release entitled, "Hanover Compressor Completes Acquisition of Natural Gas Compression Business and Related Assets of Schlumberger Creating Global Alliance." The press release stated in part:

With Completion, Schlumberger Owns 10 Percent of Hanover; Companies Enter into a Long-Term, Joint Business Development Effort.

Strategic Acquisition Significantly Extends Hanover's Global Position; Management Expects Strong Annual Revenue Growth Over Next Five Years.

Hanover Compressor, today announced that it had completed its previously announced acquisition from Schlumberger Limited of the Production Operators Corporation natural gas compression business; ownership interests in certain joint venture projects in South America; and related assets for $761 million.

Under the terms of the definitive agreement, Schlumberger received $270 million in cash, *$150 million in a long-term subordinated note and 8,707,693 shares of newly issued restricted Hanover common stock having a nominal value of $283 million, based on $32.50 per share value of Hanover common stock*. Additionally, under the terms of the agreement, Schlumberger is entitled to receive a distribution of up to $58 million upon the occurrence of certain events relating to one of the joint ventures acquired by Hanover in the transaction. Hanover management reconfirmed its belief that the transaction will add annual revenue and EBITDA of at least $200 million and $90 million, respectively, within one year.

34.     On November 7, 2001, the Company issued a press release entitled, "Hanover Compressor Reports Record Revenue and Cash Flow for 3rd Quarter; Year-over-Year Cash Flow

Before Special Charges Increases 67%; Fully Diluted 3Q01 EPS Before Special Charges $0.36 vs. $0.23." The press release stated in part:

> Hanover Compressor Company, a leading provider of outsourced natural gas compression services, today reported continued strong growth for the third quarter ended September 30, 2001. For the quarter revenues of $298.8 million increased 84 percent over the prior year quarter. Third quarter cash flow (income before taxes, interest expense, leasing expense, distributions on mandatorily redeemable convertible preferred securities and depreciation and amortization) and net income of $83.8 million and $22.5 million, or $0.29 per share, respectively, increased 52 percent and 46 percent, respectively, compared with the same quarter a year earlier.

> Cash flow before special items, excluding the effects of market to market for derivative instruments, a bridge loan fee commitment fee and a deferred lease transaction charge, was $92.3 million, a 67 percent increase over the prior year period. Net income before special charges was $28.1 million or $0.36 per share compared with $15.4 million or $0.23 per share for the third quarter of 2000.

> *"We are very pleased with Hanover's performance across all business lines," said Michael J. McGhan, President and Chief Executive Officer. "The results reflect the solid integration of Production Operators, Inc. (POI) and related assets that we recently acquired from Schlumberger Ltd., as well as excellent operation of our existing businesses, and continued sound execution of our expansion into new geographic and product markets. Our results also demonstrate strong organic growth in our outsourcing businesses, which now include compression, gas treating, process measurement and power generation. Significantly, Hanover's rental fleet utilization at the end of the quarter was 94.2 percent, reflecting both the stability of the critical production-related gas compression segment as well as the superb performance of the Company's outstanding field operations and business development groups.*

35.    On January 28, 2002, the Company disclosed the following:

–    Hanover is fabricating the equipment to be used in the gas compression and processing project with Shell under a construction contract with Hampton Roads and is accounting for this activity under the percentage of completion method of accounting. Hanover recorded total revenue from the construction contract of $16 million and net income of $2.6 million in fiscal 2000, and it recorded total revenue of $3.6 million and net income of $0.6 million for the nine-month period ended September 30, 2001. These amounts reflect the revenue related only to the majority owners' 75% interest in Hampton Roads. The Company and its Board of Directors are reviewing the transactions of this joint venture and the related accounting.

–    To date, the joint venture's majority owner has invested $4.75 million in the venture, which has been paid to Hanover by the venture in respect of the construction contract. Hanover has contributed $1.5 million to Hampton Roads, proportionate to its 25% ownership in the venture.

–    In response to a claim for expense reimbursement, the Company initiated litigation against the former majority owner in the Hampton Roads joint venture. Hanover's former majority partner in the venture was replaced entirely in July 2001 by a new, independent investment group and the joint venture is functioning successfully.

36.     The true facts, which were known by the defendants during the Class Period but concealed from the public, were:

(a)     The $16 million in revenue and $2.6 million in net income recognized in Q3 and Q4 associated with the Hampton Roads fabrication project should not have been recognized as it did not reflect the percentage of the project's completion;

(b)     Hanover's "former majority partner" in the Hampton Roads project was actually replaced on March 19, 2001, not July 2001;

(c)     Defendants "paid off" the investor in Hampton Roads the sum of $1 million in exchange for the investor's signature on the sham transaction documents on or before September 30, 2000, in order for the Company to use the same to inflate the Company's revenue and earnings as early as Q3 00;

(d)     Defendants issued a "side letter" to the Hampton Roads investor offering to loan up to $40 million to the joint venture in order to induce the investor to enter into the agreement by September 30, 2000;

(e)     In winter 2000, defendants actually knew that the Hampton Roads project completion date had been pushed out to 2003 or 2004 – not 2001;

(f)     The Registration Statement omits the Hampton Roads project *and* incorporates the Company's false and misleading Q3 and Q4 2000 financial results;

(g)     The Company's financial statements for Q1-Q3 2001 were false in that the revenue and EPS were overstated and they failed to disclose the impact of the dubious Hampton Roads project.  Moreover, these statements (in addition to the Registration Statement/Prospectus) concealed the fact that the investor in the transaction advised defendants in February 2001 that it sought to back out of the venture; and

(h)     On February 6, 2001, the investor in Hampton Roads demanded a refund of his $4 million.  Further, in a secret "behind-the-scenes" type transaction, the Company refused to refund the money directly to the investor.  Instead, defendants forwarded the money to a company related to the investor so that the transaction would go uncovered.  Finally, defendants arranged for

the "related company" to issue a Promissory Note to Hanover in the amount of $4 million (the same amount as the refund) which it agreed in an oral "side agreement" not to insist upon payment.

## FALSE FINANCIAL STATEMENTS

37.    In order to overstate its net income and EPS during the Class Period, the defendants caused the Company to violate GAAP and SEC rules by failing to disclose the true impact of Hampton Roads on the Company which, pursuant to GAAP, was required to be disclosed in Hanover's financial statements and its Registration Statement. Moreover, the Company should not have recognized the revenue/EPS associated with its dubious Hampton Roads project.

38.    Hanover included their results for Q3 00, Q4 00, Q1 01, Q2 01 and Q3 01 in press releases and in SEC filings, including Form 10-Qs for the interim results and Form 10-Ks (for 2000) for the annual results. The SEC filings represented that the financial information was a fair statement of its financial results and that the results were prepared in accordance with GAAP.

39.    These representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's operations due to the Company's improper accounting for its Hampton Roads joint venture, causing the financial results to be presented in violation of GAAP and SEC rules.

40.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a)(1)), states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

41.    Moreover, pursuant to §13(b)(2) of the Exchange Act, Hanover was required to:

>    (A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(i) transactions are executed in accordance with management's general or specific authorization;

(ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles ....

42. Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a) The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b) The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c) The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d) The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e) The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance,

those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)  The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)  The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)  The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

43.  Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## CLASS ACTION ALLEGATIONS

44.  Plaintiff brings this lawsuit pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and on behalf of a class of persons who purchased Hanover publicly traded securities from November 8, 2000 through January 28, 2002, inclusive (the "Class").  Excluded from the Class are defendants herein, members of the immediate families of each of the defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any of the defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

45.  This action is properly maintainable as a class action for the following reasons:

00036319

(a)     The Class is so numerous that joinder of all Class members is impracticable. As of November 1, 2001, Hanover had approximately 79 million shares outstanding.  Members of the Class are scattered throughout the United States.

(b)     There are questions of law and fact which are common to members of the Class and which predominate over any questions affecting only individual members.  The common questions include, *inter alia*, the following:

(i)     Whether the defendants' acts as alleged herein violated the federal securities laws;

(ii)     Whether defendants participated in and pursued the common course of conduct complained of herein;

(iii)     Whether documents, SEC filings, press releases and other statements disseminated to the investing public and Hanover's common stockholders during the Class Period misrepresented material facts about the operations, financial condition and earnings of Hanover;

(iv)     Whether the market prices of Hanover publicly traded securities during the Class Period were artificially inflated due to material misrepresentations and the failure to correct the material misrepresentations complained of herein; and

(v)     To what extent the members of the Class have sustained damages and the proper measure of damages.

(c)     Plaintiff's claims are typical of the claims of other members of the Class and plaintiff has no interests that are adverse or antagonistic to the interests of the Class.

(d)     Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in litigation of this nature.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

(e)     Plaintiff anticipates that there will not be any difficulty in the management of this litigation as a class action.

46.     For the reasons stated herein, a class action is superior to other available methods for the fair and efficient adjudication of this action and the claims asserted herein.  Because of the size

00036319

of the individual Class members' claims, few, if any, Class members could afford to seek legal redress individually for the wrongs complained of herein.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

47.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

48.     This Count is brought by plaintiff pursuant to §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all defendants.

49.     The defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Hanover securities in an effort to maintain artificially high market prices for Hanover securities in violation of §10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and/or as controlling persons as alleged below.

50.     In addition to the duties of full disclosure imposed on the defendants by their status as controlling persons of Hanover, as a result of their affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to Hanover's securities, operations, financial condition and earnings so that the market price of Hanover publicly traded securities would be based on truthful, complete and accurate information.

51.     Defendants, individually and in concert, directly and indirectly, by using the means and instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations

and future prospects of Hanover as specified herein. The defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Hanover's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Hanover and its business operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Hanover publicly traded securities during the Class Period.

52.    The primary liability and controlling person liability of defendants arises from the fact that during the Class Period, the defendants engaged in a scheme to conceal Hanover's Hampton Roads transaction to prevent the decline in the price of Hanover securities so that defendants could use Hanover's artificially inflated stock as currency to complete an acquisition and to reap at least $177 million in insider trading proceeds.

53.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein. Such defendants' material misrepresentations or omissions were done knowingly and for the purpose and effect of concealing Hanover's operating condition and future business prospects from the investing public and supporting the artificially inflated prices of their securities, as demonstrated by said defendants' overstatements and misstatements of Hanover's business, operations and future earnings prospects and/or financial statements throughout the Class Period.

54.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts by all defendants, as set forth above, the market prices of Hanover publicly traded securities were artificially inflated during the Class Period. In ignorance of the fact that the market prices for Hanover securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and the truth of any representations made to appropriate

agencies and to the investing public, at the times at which any statements were made, and/or on the absence of material adverse information that was known by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Hanover publicly traded securities during the Class Period at artificially high prices and were damaged thereby.

55.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of Hanover, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased Hanover publicly traded securities during the Class Period, or, if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

56.     By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

57.     As a direct and proximate result of the wrongful conduct of the defendants, plaintiff and the other members of the Class suffered damages in connection with their purchases of Hanover publicly traded securities during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the
### Exchange Act Against All Defendants

58.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

59.     Defendants acted as controlling persons of Hanover within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, substantial stock holdings, participation in and/or awareness of Hanover's operations and/or intimate knowledge of its internal financial condition, business practices, products and the actual progress of development and marketing efforts, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Hanover, including the content

and dissemination of the various statements which plaintiff contends are false and misleading. Hanover controlled the Individual Defendants and all of its employees. Each of the Individual Defendants was provided with or had unlimited access to copies of Hanover's internal reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

60.     In particular, each of the Individual Defendants had direct involvement in or intimate knowledge of the day-to-day operations of Hanover and therefore is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

61.     As set forth above, defendants violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, defendants are liable pursuant to §20(a) of the Exchange Act.

62.     As a direct and proximate result of the wrongful conduct of defendants, plaintiff and other members of the Class suffered damages in connection with their purchases of Hanover publicly traded securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A.     Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding plaintiff and other members of the Class damages together with interest thereon;

C.     Awarding plaintiff and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.     Awarding plaintiff and other members of the Class such equitable/injunctive and/or other and further relief as may be just and proper under the circumstances.

00036319

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  February 4, 2002

SCHWARTZ, JUNELL, CAMPBELL
  & OATHOUT, LLP
ROGER B. GREENBERG
Federal I.D. No. 3932
State Bar No. 08390000

ROGER B. GREENBERG

Two Houston Center
909 Fannin, Suite 2000
Houston, TX  77010
Telephone:  713/752-0017

**Attorney in Charge**

**Of Counsel:**

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
401 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

BARRETT, JOHNSTON & PARSLEY
GEORGE E. BARRETT
DOUGLAS S. JOHNSTON, JR.
TIMOTHY L. MILES
217 Second Avenue, North
Nashville, TN  37201-1601
Telephone:  615/244-2202
615/252-3798 (fax)

BRANSTETTER, KILGORE, STRANCH
  & JENNINGS
JAMES G. STRANCH III
227 Second Avenue, North
4th Floor
Nashville, TN  37201-1631
Telephone:  615/254-8801
615/255-5419 (fax)

::ODMA\WORLDOX\P:\DOCS\RGREEN\00036319.WPD

00036319

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

PIRELLI ARMSTRONG TIRE CORPORATION RETIREE MEDICAL BENEFITS TRUST ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

Acquisitions:

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 02/07/01 | 336 shares | $37.99 |
| 02/08/01 | 84 shares | $37.89 |
| 06/26/01 | 555 shares | $35.32 |
| 06/27/01 | 1,345 shares | $35.01 |

5.  During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below:

*Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust v. Cisco Systems, Inc., et al.*, No. C-01-1612-VRW (N.D. Cal.)

*In re Dollar General Sec. Litig.*, No. 3:01-0388 (M.D. Ten.)

6.  The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost

wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _1st_ day of February, 2002.

> PIRELLI ARMSTRONG TIRE
> CORPORATION RETIREE MEDICAL
> BENEFITS TRUST
>
> By: _____
>          EARL SEYMOUR
>
> Its: Chairman of the Board of Directors

- 2 -