

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PIRELLI ARMSTRONG TIRE CORPORATION RETIREE MEDICAL BENEFITS TRUST, et al., On Behalf of Themselves and All Others Similarly Situated, | § § § § § | Civil Action No. H-02-0410 (Consolidated) Hon. Vanessa D. Gilmore |
| Plaintiffs, | § § § § | CLASS ACTION |
| vs. | § § | |
| HANOVER COMPRESSOR COMPANY, et al., | § § § | |
| Defendants. | § | |

---

| | | |
|---|---|---|
| HARBOR FINANCE PARTNERS, Derivatively on Behalf of HANOVER COMPRESSOR CO., | § § § | Civil Action No. H-02-0761 Hon. Melinda Harmon |
| Plaintiffs, | § § § | |
| vs. | § § | |
| MICHAEL MCGHAN, WILLIAM GOLDBERG, TED COLLINS, ROBERT FURGASON, MELVYN KLEIN, MICHAEL O'CONNOR and ALVIN SHOEMAKER, | § § § § § § | |
| Defendants, | § § | |
| -and- | § § | |
| HANOVER COMPRESSOR COMPANY, a Delaware corporation, | § § § | |
| Nominal Defendant. | § | |

---

**PLAINTIFF HARBOR FINANCE PARTNERS' MEMORANDUM
IN OPPOSITION TO DEFENDANTS' MOTION FOR CONSOLIDATION**

81

| | | |
|---|---|---|
| ANN ANGLEOPOULOS, On Behalf of Herself and All Others Similarly Situated, | § § § | Civil Action No. H-03-1064 Hon. Melinda Harmon |
| Plaintiffs, | § § | |
| vs. | § § § | |
| HANOVER COMPRESSOR COMPANY, MICHAEL J. MCGHAN, MICHAEL A. O'CONNOR, CHAD C. DEATON, and UNKNOWN FIDUCIARY DEFENDANTS 1-100, | § § § § § § | |
| Defendants. | § § | |

---

| | | |
|---|---|---|
| JOYCE FREEMAN, On Behalf of Herself And All Others Similarly Situated, | § § | Civil Action No. H-03-1095 Hon. Lynn N. Hughes |
| Plaintiffs, | § § | |
| vs. | § § | |
| HANOVER COMPRESSOR COMPANY, MICHAEL J. MCGHAN, MICHAEL A. O'CONNOR, CHAD C. DEATON, and UNKNOWN FIDUCIARY DEFENDANTS 1-100, | § § § § § § | |
| Defendants. | § § | |

---

| | | |
|---|---|---|
| HENRY DUNCAN KIRKLEY, On Behalf of Himself, All Others Similarly Situated and The Hanover Companies Retirement Savings Plan, | § § § § | Civil Action No. H-03-1155 Hon. David Hittner |
| Plaintiffs, | § § § | |
| vs. | § § § | |
| HANOVER COMPANIES, MICHAEL J. MCGHAN, WILLIAM S. GOLDBERG, and MICHAEL A. O'CONNOR, | § § § § | |
| Defendants. | § § | |

---

# TABLE OF CONTENTS

Page

Statement of Facts ............................................................ 2

Argument ..................................................................... 5

I.     DEFENDANTS' MOTION FOR CONSOLIDATION
SHOULD BE DENIED.................................. 5

     A.    Consolidation Must Be Fair To All
Parties............................................. 6

     B.    Consolidation Will Create a Serious
Conflict of Interest .............................. 7

     C.    The Focus of Litigation is Necessarily
Different in the Derivative and Securities
Class Actions...................................... 9

     D.    Coordination of the Class and Derivative
Actions can Accomplish the Same Goals of
Efficiency and Economy without Prejudicing
the Derivative Plaintiffs' Claims, Rights and
Interests .......................................... 11

Conclusion ................................................................. 12

i

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Brickman v. Tyco Toys, Inc.*
731 F. Supp. 101 (S.D.N.Y. 1990)……………………………………..    8

*Carrabba v. Randall's Food Markets, Inc.*
191 F. Supp.2d 815 (N.D.Tex. 2002)…………………………………..    5

*Dupont v. Southern Pacific Co.*
366 F.2d 193 (5th Cir. 1966)…………………………………………    1, 7

*Gibb v. Delta Drilling Co.*
104 F.R.D. 59 (N.D. Tex. 1984)………………………………………    8, 9

*Huene v. United States*
743 F.2d 703 (9th Cir. 1984)…………………………………………    9

*In re Continental Secur. Litig.*
1984 U.S. Dist. LEXIS 17777 (N.D. Ill. April 9, 1984)………………..    8

*In re Dresser Indus., Inc.*
972 F.2d 540 (5th Cir. 1992)…………………………………………    1

*In re Enron Corp. Sec. Derivative & ERISA Litig.*
196 F. Supp.2d 1375 (M.D.L. 2002)…………………………………    6

*In re Oracle Secur. Litig.*
829 F. Supp. 1176 (N.D. Cal. 1993)…………………………………    8

*Kamerman v. Steinberg*
113 F.R.D. 511 (S.D.N.Y. 1986)………………………………………    8

*Meeder v. Superior Tube Company*
72 F.R.D. 633 (W.D. Pa. 1976)………………………………………    11

*Petersen v. Federated Development Co.*
416 F. Supp. 466 (S.D.N.Y. 1976)……………………………………    7

*Road Sprinkler Fitters Local Union v. Continental Sprinkler Co.*
967 F.2d 145 (5th Cir. 1992)…………………………………………    9

*Ruggiero v. American Bioculture, Inc.*
56 F.R.D. 93 (S.D.N.Y. 1972)…………………………………………  8

*Ryan v. Aetna Life Ins. Co.*
765 F. Supp. 133 (S.D.N.Y. 1991)……………………………………..  8

*St. Bernard Gen. Hosp. Inc. v. Hospital Service Ass'n*
712 F.2d 978 (5th Cir. 1983) …………………………………………  1, 7

*United States v. City of Miami*
614 F.2d 1322 (5th Cir. 1980)………………………………………...  5

*Waste Distillation Technology, Inc. v. Pam American Resources, Inc.*
775 F. Supp. 759 (D. Del. 1991)…………………………………….  10

**STATUTES**

Fed. R. Civ. P. 23.1 …………………………………………………  7, 8, 9

**OTHER LEGAL AUTHORITY**

8 MOORE'S FEDERAL PRACTICE § 42.10………………………..  6

8 MOORE'S FEDERAL PRACTICE § 42.13…………………………..  9,

Plaintiff Harbor Finance Partners ("Harbor" or "Plaintiff") respectfully submits this opposition to defendants' motion to consolidate this Federal Rule of Civil Procedure 23.1 derivative action *on behalf of* Hanover Compressor Co. ("Hanover") into a consolidated securities class action *against* Hanover.

While Harbor would be pleased to have its action heard by any judge of the Southern District, as will be shown, consolidation of Harbor's derivative action *on behalf of* Hanover *into* a securities class action *against* Hanover, would irreparably prejudice Harbor and the claims it asserts, and thus should not be permitted. *See St. Bernard Gen. Hosp. Inc. v. Hospital Service Ass'n,* 712 F.2d 978, 990 (5th Cir. 1983) ("consolidation is improper if it would prejudice the rights of the parties"); *Dupont v. Southern Pacific Co.,* 366 F.2d 193, 197 (5th Cir. 1966) ("in resorting to the use of Rule 42(a) the trial judge should be most cautious not to abuse his judicial discretion and to make sure that the rights of the parties are not prejudiced by the order of consolidation under the facts and circumstances of the particular case").[1]

Rather, should the Court be inclined to have Harbor's derivative action on behalf of Hanover heard by the same judge as is hearing the securities class action against Hanover, all of the benefits of consolidation without the irreparable prejudice to plaintiff could be achieved by coordinating the actions for discovery and for hearing any proposed settlement the Court is inclined to hear.

---

[1]    Indeed, the prejudice to Harbor would be even worse, as there is an existing order in the securities class action which appoints plaintiffs' lead counsel, and thus were Harbor's derivative action consolidated into the securities class action, the same plaintiffs' lead counsel would be responsible for simultaneously prosecuting claims *against* Hanover and claims *on behalf of* Hanover. *Cf. In re Dresser Indus., Inc.,* 972 F.2d 540, 543 (5th Cir. 1992) (under Texas Disciplinary Rules, a lawyer generally may not represent conflicting parties in litigation).

### Statement of Facts

Harbor's derivative action on behalf of Hanover was the first derivative action on behalf of Hanover filed in the Southern District, and it was filed on March 1, 2002. Harbor seeks to recover from Hanover's directors and on behalf of Hanover for these defendants' breaches of fiduciary duty to Hanover in allegedly making untruthful and misleading statements which caused the price of Hanover stock to be inflated, and then utilizing that opportunity to sell millions of dollars of Hanover stock for their own personal benefit.

Over a month later, beginning on April 10, 2002, three other derivative actions on behalf of Hanover were filed in the Southern District by Roger Koch, Henry Carranza and William Steves. Of note, is that the complaints in these three actions were *identical to each other word for word,* thus suggesting that they may have been filed in a coordinated attempt to seize control of Harbor's action. *See* Exhibits 1-3 to the accompanying Declaration of Joseph H. McDermott, III.[2]

Further, plaintiff Koch's counsel, Brian Robbins, is the brother of the lead attorney representing plaintiffs in the securities action against Hanover, Darren J. Robbins of Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss").[3] In this regard, each of the Koch, Carranza and Steves complaints appear to have been copied *almost verbatim* from the Milberg Weiss securities action. *Compare* Exhibits 1-3 to the

---

[2] Harbor believes that this may well have been because it is the only institutional plaintiff to have brought a derivative action on behalf of Hanover and because it is the only plaintiff to have a track record of being a vigorous and effective advocate for shareholder rights. *See e.g. Harbor Finance Partners derivatively on behalf of Rally's Hamburgers, Inc. v. Sugarman,* 1997 Del. Ch. LEXIS 49 (April 3, 1997).

[3] Plaintiff Koch recently conceded as much in papers filed with Judge Harmon on May 21, 2003.

McDermott Declaration at ¶¶ 24-40, 42-50, 54-61 with Exhibit 4 to the McDermott Declaration at ¶¶ 10-26, 27-35, 36-43.

Of further note is that the Milberg Weiss firm has in the past been publicly reported to use proxy law firms to surreptitiously control litigation on its behalf. *See* Exhibit 5 to the McDermott Declaration at pp.196-98; Exhibit 6 to the McDermott Declaration, and that, as discussed *infra,* it is clearly established that an attorney almost always has a conflict of interest in simultaneously representing a derivative and a class plaintiff.[4]

Plaintiffs Koch, Carranza and Steves, after filing their complaints (which as noted were identical to each other and all appeared to have been substantially copied from Milberg Weiss' securities fraud class action complaint), filed a motion to consolidate their derivative actions into Harbor's first filed derivative action and to appoint Mr. Brian Robbins as lead counsel in the consolidated derivative action. Harbor cross-moved to consolidate, but argued that its counsel, the Brualdi Law Firm – which has a significant track record of successfully prosecuting derivative actions -- should be appointed as lead counsel instead.

On August 19, 2002, Judge Harmon consolidated Koch's, Carranza's and Steves' actions into Harbor's first filed action, but has not yet ruled on which law firm should be appointed plaintiffs' lead counsel.

---

[4]     As was also briefed to Judge Harmon on May 14, 2003, conflicts of counsel also attach to their siblings, and thus a lawyer may not use a counsel who is a sibling to fill a role he or she would have a conflict of interest in performing.

In the interim, on January 7, 2003, Milberg Weiss (with its lead attorney being Mr. Darren Robbins – *see* Exhibit 7 to the McDermott Declaration), was appointed lead counsel for plaintiffs in the consolidated securities fraud actions against Hanover.

Milberg Weiss and Mr. Darren Robbins thereafter began settlement negotiations on behalf of the plaintiffs in the consolidated securities fraud action *against* Hanover, and, notwithstanding that Mr. Brian Robbins was not lead derivative counsel, insisted that defendants simultaneously commence negotiations to settle the derivative action *on behalf of* Hanover with Mr. Brian Robbins – notwithstanding the conflict this presented and notwithstanding that there was a motion to appoint lead derivative counsel *sub judice* with Judge Harmon.

Thereafter, a proposed comprehensive settlement was reached which, if approved by the Court, would settle the consolidated securities fraud action against Hanover and Harbor's derivative action on behalf of Hanover.[5]  As plaintiffs Koch, Carranza and Steves recently conceded in papers filed with Judge Harmon on May 21, 2003, Harbor's counsel was given a call late on the Friday afternoon of May 9 to be advised for the first time of the proposed settlement and told that if he did not promptly join it as is, it would be publicly announced, which it was the following Monday.

Harbor and its counsel intend to object to the proposed settlement if the Court sets it down for a hearing, both because it provides inadequate benefits for Hanover and because the process by which it was reached was the subject of conflicting interests (the

---

[5]     It would also settle ERISA claims against Hanover which are the subject of yet a third lawsuit.

separate interests of the derivative and securities class actions) and hence irremediably flawed.[6]

Defendants have now moved to consolidate Harbor's derivative action *on behalf of* Hanover into the pending securities fraud action *against* Hanover. As will be shown, such consolidation would irreparably prejudice Harbor and the derivative action on behalf of Hanover and thus defendants' motion should be denied.

## Argument

### I. DEFENDANTS' MOTION FOR CONSOLIDATION SHOULD BE DENIED

It is respectfully submitted that defendants' motion for consolidation should be denied for three reasons.

First, Harbor in its derivative action seeks a fundamentally different – indeed incompatible – remedy from that sought by plaintiffs in the securities class action, since Harbor seeks to recover damages *for the benefit of Hanover,* while the securities class action seeks a recovery *from Hanover.* Both goals cannot be pursued in the same action, particularly under the direction of the same lead plaintiff's counsel, with equal attention and vigor.

---

[6] The inadequacy of the benefits for Hanover will be briefed if and when the Court schedules a hearing on the proposed settlement. *See e.g. United States v. City of Miami,* 614 F.2d 1322, 1332 (5th Cir. 1980) (Court is a "fiduciary" in representative actions and must subject proposed settlements to "careful scrutiny"); *Carrabba v. Randall's Food Markets, Inc.,* 191 F. Supp.2d 815, 824 (N.D. Tex. 2002) (same).

The flawed process is briefly described above and will also be fully briefed. *C.f. Polar Int'l Brokerage Corp. v. Reeve,* 187 F.R.D. 108, 113 (S.D.N.Y. 1999) (in considering adequacy of settlement in representative action "the Court must also look at the negotiating process leading up to the settlement"); *In re Dennis Greenman Sec. Litig.,* 829 F.2d 1539, 1544 (11th Cir. 1987) (similar).

Second, should the proposed settlement be rejected (as Harbor will argue it should be), the focus of the litigation will be different in the two types of actions. Harbor, as a derivative plaintiff, will focus on allegations that it is the individual defendants who should bear responsibility for their harm to Hanover, while the securities class action plaintiffs will focus on allegations that it is Hanover that should bear responsibility for its alleged harm to them.

Third, the stated benefits of consolidation – efficiency and the economical use of judicial resources – largely can be obtained by *coordinating* Harbor's derivative action on behalf of Hanover and the direct class action pending against Hanover. Coordination would streamline the proceedings, particularly in the area of discovery, and also allow the proposed settlement (should the Court be inclined to hear it) to be heard before one judge, while giving Harbor the control and autonomy necessary to fairly, effectively and efficiently prosecute its case – particularly if the proposed settlement is rejected, as Harbor is confident it will be.[7]

## A. Consolidation Must Be Fair To All Parties

Consolidation should not adversely impact a party's rights, and efficiency and judicial economy must <u>never</u> take precedence over fairness to the parties. 8 MOORE'S FEDERAL PRACTICE §42.10 [2][a][b], 4[a], 5[d][1].

> **Consolidation is inappropriate when it will adversely affect the rights of the parties [citations omitted]. A party may be prejudiced when the claims or defenses particular to that party are substantially different from the other consolidated claims, and management of the consolidated case is vested in lead counsel, whose efforts are likely to**

---

[7] Notably, the only case cited by defendants in their motion papers, *In re Enron Corp. Secs. Derivative & ERISA Litig.,* 196 F. Supp.2d 1375 (M.D.L. 2002) coordinated various derivative and class actions and did not consolidate them.

> focus on the interest of the majority, thereby depriving the minority of
> full discovery and preparation.

*Id.* at §42.10[5][d].[8]  *See also St. Bernard Gen. Hosp. Inc. v. Hospital Service Ass'n,* 712

F.2d 978, 990 (5th Cir. 1983) ("consolidation is improper if it would prejudice the rights

of the parties"); *Dupont v. Southern Pacific Co.,* 366 F.2d 193, 197 (5th Cir. 1966) ("in

resorting to the use of Rule 42(a) the trial judge should be most cautious not to abuse his

judicial discretion and to make sure that the rights of the parties are not prejudiced by the

order of consolidation under the facts and circumstances of the particular case").

Here, consolidation will severely prejudice derivative plaintiff Harbor, both

because there is a serious conflict between its goals in this suit *on behalf of* Hanover and

those of the direct, securities class action plaintiffs in their suit *against* Hanover, and

because its individual interests will be subsumed in proceedings that are directed and

controlled by a majority driven plaintiff's lead counsel.

**B.  Consolidation Will Create a Serious Conflict of Interest**

The present derivative action is one brought "to enforce a right of a corporation,"

here Hanover.  *See* Fed. R. Civ. P. 23.1.  In contrast, the securities class actions

consolidated at *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Di Leo et*

*al.,* No. H-02-CV-410 are securities fraud class actions brought *against* Hanover and

seeking a recovery from Hanover.  *See e.g. Petersen v. Federated Development Co.,* 416

F. Supp. 466, 475 n.6 (S.D.N.Y. 1976) (collecting citations).

---

[8]      MOORE'S further states that "[a]lthough the articulated purpose of consolidation
is economy in judicial administration, it can, as a practical matter, substantially affect the
rights of the parties.  An order for consolidation for trial, as opposed to one solely for
consolidated pretrial proceedings, may have the effect of 'deny[ing] a party his due
process right to prosecute his own separate and distinct claims or defenses without having
them so merged into the claims or defenses of others that irreparable injury will result.'"
MOORE'S §42.13[1], *citing Garber v. Randall,* 477 F.2d 711, 716 (2d Cir. 1973).

Courts have found that the relief sought in a derivative action is fundamentally incompatible with that sought by plaintiffs who seek damages from the corporation itself. *See, e.g., Gibb v. Delta Drilling Co.,* 104 F.R.D. 59, 81 (N.D. Tex. 1984) ("Courts have found genuine conflicts of interest that fall into the following categories . . . (2) when the proposed class representative has instituted both a derivative suit on behalf of the corporation and its existing shareholders and a class action against the corporation on behalf of former shareholders"); *Ryan v. Aetna Life Ins. Co.,* 765 F. Supp. 133, 135-37 (S.D.N.Y. 1991) ("[Plaintiff] Ryan is subject to a conflict of interest in pursuing both direct and derivative claims, which renders him unable "fairly and adequately [to] represent the interests of the shareholders as required under Fed. R. Civ. P. 23.1.""); *Brickman v. Tyco Toys, Inc.,* 731 F. Supp. 101, 109 (S.D.N.Y. 1990) (referring to "the per se rule against contemporaneous derivative and direct class suits which has been adopted"); *Kammerman v. Steinberg,* 113 F.R.D. 511, 516 (S.D.N.Y. 1986) ("Prosecution of both a derivative and class action by plaintiffs Kammerman and Stepak presents an impermissible conflict of interest"); *In re Oracle Secur. Litig.,* 829 F Supp. 1176, 1184-85 (N.D. Cal. 1993) ("inherent conflict between the interests supposedly protected by the class action and those benefited by the derivative action"); *In Re: Continental Secur. Litig.,* 1984 U.S. Dist. LEXIS 17777 (N.D. Ill. April 9, 1984) ("The Court has concluded that in the circumstances of this case there are potential conflicts of interest which make it inadvisable for the same attorneys to represent the plaintiffs in the class action and the derivative plaintiff"); *Ruggiero v. American Bioculture, Inc.,* 56 F.R.D. 93, 95 (S.D.N.Y. 1972) ("I fail to see how, on the one hand [plaintiffs] can vigorously seek recovery on behalf of those who have an equity interest in the corporation and, on the other hand

vigorously seek recovery from the corporation on behalf of those who have no equity interest in the corporation.").[9]

While plaintiffs and counsel are currently different in Harbor's derivative action and the securities class action, consolidation, practically speaking, would result in the disparate actions being treated as one action, and the same concerns about conflicts of interest therefore apply. In fact, there has in practice been a tendency to treat the consolidated cases as though they have merged. 8 MOORE'S FEDERAL PRACTICE, § 42.13 [1-3]. *See, e.g., Road Sprinkler Fitters Local Union v. Continental Sprinkler Co.,* 967 F.2d 145, 149 (5th Cir. 1992); *Huene v. United States,* 743 F.2d 703, 704 (9th Cir. 1984). Thus, derivative plaintiff Harbor and the interests that it represents would be substantially prejudiced were consolidation of Harbor's derivative action with the securities class actions to occur.

### C. The Focus Of Litigation Is Necessarily Different In The Derivative and Securities Class Actions

Even if there were not an obvious conflict of interest, consolidation will severely prejudice derivative plaintiff Harbor by not permitting it to appropriately focus, or exercise control over, the conduct of the derivative action.

Initially, derivative plaintiff Harbor may face a motion to dismiss on demand grounds under Fed. R. Civ. P. 23.1, something with which the class actions need not be concerned. Derivative plaintiff Harbor must vigorously defend against such a motion,

---

[9] Some Courts have allowed a plaintiff to simultaneously represent plaintiffs in a class and derivative action where the class consists solely of current, but not former shareholders (because a derivative action is on behalf of the corporation and hence inherently seeks to benefit the corporation's current, but not its past, shareholders). *See e.g. Gibb,* 104 F.R.D. at 81. This is not the case here, as the *Pirelli Armstrong Tire* action seeks to recover on behalf of former Hanover shareholders.

and should not be hindered from doing so by the class action's counsel, whose attentions will be focused on majority, class issues, such as surviving a motion to dismiss under the PSLRA and obtaining class certification. Conversely, these are not matters with which Harbor need, or should, be involved.

Further, the prosecution of Harbor's derivative action must focus on allegations that it is the individual defendants who should bear responsibility for breaching the fiduciary duties they owed to Hanover, thereby harming the Company by, *inter alia*, disseminating material false and misleading financial statements, failing to implement appropriate accounting practices and controls, and personally profiting through insider sales of stock based on their misappropriation of proprietary internal (and adverse) corporate information. Conversely, the securities class actions will not focus on the allegations in the derivative complaints, since the class actions seek a primary recovery from the Company, while Harbor seeks to prosecute its claims in order to recover for the benefit of the Company. Ironically, these types of distinctions can create the very delays that consolidation was intended to help eliminate, since derivative plaintiff Harbor may be prevented from moving ahead with issues germane to its own case pending the resolution of matters that are pertinent only to the class.[10]

Even the simplification sought to be achieved through consolidation works to derivative plaintiff Harbor's disadvantage. MOORE'S states that "[t]he practical effect of a consolidated pleading is that it eliminates the need for multiple complaints and streamlines discovery, allowing it to be directed to the consolidated complaint, rather

---

[10] *See Waste Distillation Technology, Inc. v. Pam American Resources, Inc.,* 775 F. Supp. 759 (D. Del. 1991) (consolidating actions for copyright infringement). "The savings of time and effort gained through consolidation must be balanced against the inconvenience,

than to each individual plaintiff's complaint." *Id.* at § 42.13[5][a].  Thus, in order for consolidation to achieve its basic goal of efficiency, derivative plaintiff Harbor would have to subordinate its rights and interests to that of the majority of class actions, without any corresponding advantages of fairness or efficiency either to Harbor or to the Court, which, as demonstrated below, could only be achieved though coordination of the actions.

> **D.  Coordination of the Class and Derivative Actions can accomplish the same goals of efficiency and economy without prejudicing the Derivative Plaintiff's claims, rights and interests**

Derivative Plaintiff Harbor respectfully submits that, should the Court wish to have both its derivative action and the securities class action heard by the same judge, coordination would be the fairer choice.   Coordination would accomplish the desired goals of efficiency and judicial economy (primarily by streamlining the discovery process) while protecting the rights and interests of derivative plaintiff Harbor.

For example, in *Meeder v. Superior Tube Company,* 72 F.R.D. 633 (W.D. Pa. 1976), the Court declined to consolidate shareholder complaints when it appeared that there could be substantial differences between, *inter alia,* the class and derivative actions. The court instead ordered that the actions be coordinated.  The court stated:

> **[W]hile the three complaints arise out of the same circumstances, that is the tender offer by Superior, the defendants are not all common to all the cases; one complaint contains a count alleging a derivative suit by Williams; one plaintiff a corporation.  There are, then, differences. There may even be more differences than those that we have noted. Whether those differences are differences of form or of substance remains to be seen.**

delay or expense that might result from simultaneous disposition of the separate actions." *Id.* at 761.

11

It makes sense, therefore, to permit each attorney to control the destiny of his own client's case at this time. But to avoid duplication **and unnecessary inconvenience to the parties and witnesses there should be coordinated discovery.**"

*Id.* at 636-37 (emphasis added).

### Conclusion

For all of the foregoing reasons, plaintiff Harbor respectfully requests that the Court deny defendants motion to consolidate its derivative action on behalf of Hanover with the securities class action against Hanover, and that if the Court is inclined to have one judge hear both cases that it instead order the cases coordinated.

Dated May 30, 2003

Respectfully submitted,

JOSEPH A. McDERMOTT, III, ESQ.

By: Joseph A. McDermott, III
SBN 13531800
3100 Richmond Avenue
Houston, Texas 77098
Telephone: (713) 527-9190
Facsimile: (713) 527-9633
Attorney in Charge for Plaintiff
Harbor Finance Partners

Richard B. Brualdi
Kevin T. O'Brien
The Brualdi Law Firm
29 Broadway, Suite 1515
New York, New York 10006
(212) 952-0602

Of Counsel for Plaintiff
Harbor Finance Partners

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing plaintiff Harbor Finance Partners' Memorandum in opposition to Defendants' Motion to Consolidate was served via first class mail on the counsel listed below on this 2nd day of June, 2003.

_____
Joseph A. McDermott, III

Thomas Paterson
Susman & Godfrey, LLP
1000 Louisiana St.
Suite 5100
Houston, Texas 5100 75002
Telephone: (713) 651-9366
Facsimile: (713) 654-3892

Counsel for Defendant Hanover Corporation

Kevin Abikoff
Hughes, Hubbard & Reed
1775 I Street, N.W.
Washington, D.C. 20006-2401
Telephone: (202) 721-4600
Facsimile: (202) 721-4646

Counsel for Defendant Hanover Corporation and Defendant Chad Deaton

Pamela G. Smith
David H. Kristenbroker
Katten, Muchin Zavis & Rosenman
525 West Monroe, Suite 1600
Chicago, Illinois 60661-3693
Telephone: (312) 902-5200
Facsimile: (312) 902-1061

Counsel for Defendant William S. Goldberg

Eric J.R. Nichols
Beck Redden & Secrest
One Houston Center
1221 McKinney Street, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3701
Facsimile: (713) 951-3720

Counsel for Defendant Michael J. McGhan

Harvey G. Brown, Jr.
Orgain, Bell & Tucker
2700 Post Oak, Suite 1410
Houston, Texas 77056
Telephone: (713) 572-8772

Counsel for Defendant Michael A. O'Connor

Brian J. Robbins
Robbins Umeda & Fink, LLP
1010 Second Avenue, Suite 2360
San Diego, California 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Counsel for Plaintiff Koch

James D. Baskin, III
The Baskin Law Firm
919 Congress Avenue, Suite 1000
Austin, Texas 78701
Telephone: (512) 381-6300
Facsimile: (512) 322-9280

Counsel for Plaintiff Koch

David R. Scott
Neil Rothstein
James E. Miller
Scott & Scott LLC
108 Norwich Avenue
Colchester, Connecticut 06415
Telephone: (860) 537-3818
Facsimile: (860) 537-4432

Counsel for Plaintiff Carranza

Tom Cunningham
Cunningham, Darlow, Zook &
Chapoton LLP
600 Travis, Suite 1700
Houston, Texas 77002
Telephone: (713) 255-5500
Facsimile: (713) 255-5555

Counsel for Plaintiff John B. Hensley, Jr.

Robert C. Schubert
Juden Justice Reed
William H. Jonckheer
Aaron H. Darsky
Schubert & Reed, LLP
Two Embarcadero Center, Suite 1660
San Francisco, California 94111
Telephone: (415) 788-4220
Facsimile: (415) 788-0161

Counsel for Plaintiff John B. Hensley, Jr.

Paul T. Warner
Reich & Binstock
4625 San Felipe, Suite 1000
Houston, Texas 77027
Telephone: (713) 622-7271
Facsimile: (713) 623-8724

Counsel for Plaintiffs Koch, Carranza,
and Steves

David M. Goldstein
Maricic & Goldstein, LLP
10535 Foothill boulevard, Suite 300
Rancho Cucamonga, California 91729
Telephone: (909) 945-9549
Facsimile: (909) 980-5525

Counsel for Plaintiff Steves

Darren J. Robbins
MILBERG WEISS BERSHAD
HYNES & LERACH LLP
401 B Street, Suite 700
San Diego, CA 92101

Counsel for Lead Plaintiffs Pirelli
Armstrong Tire, Retiree Medical
Benefits, Trust, Plumbers &
Steamfitters, Local 137, Pension
Fund, O. Bryant Lewis, 720 Capital
Management, LLC and Specialists
DPM

Richard S. Schiffrin
Robert B. Weiser
Eric L. Zagar
SCHIFFRIN & BARROWAY, L.L.P.
Three Bala Plaza East, Suite 400
Bala Cynwyd, Pennsylvania 19004

Counsel for Angeleopoulos

Thomas E.Bilek
HOEFFNER & BILEK, L.L.P.
440 Louisiana Street., Suite 720
Houston, TX 77002

Counsel for Angleopoulos and Freeman

Evan Smith
BRODSKY & SMITH, L.L.C.
240 Mineola Boulevard
Mineola, New York 11501

Counsel for Freeman

Edward B. Horahan, III
DECHERT LLP
1175 I Street, N.W.
Washington, DC 20006-2401

Counsel for Defendant Charles D.Erwin

Craig Smyser
SMYSER KAPLAN & VESEKLA, L.L.P.
Bank of America Center
700 Louisiana Street, Suite 2300
Houston, TX 77002

Counsel for Defendants Melvyn N. Klein,
Ted Collins, Jr., Robert R. Furgason,
Rene J. Huck and Alvin V.Shoemaker

Steven J. Rothchild
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
One Rodney Square
Wilmington, DE 19801

Counsel for Defendants Victor E. Grijalva,
Gordon T. Hall, and I. Jon Brumley

Richard B. Brualdi
The Brualdi Law Firm
29 Broadway, Suite 1515
New York, New York 10006

Counsel for Plaintiff Harbor
Finance Partners

Richard A. Rosen
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064

Counsel for GKH

Exhibit 1

Exhibit 1



COPY

United States Courts
Southern District of Texas
FILED

APR 1 0 2002

Michael N. Milby, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| ROGER KOCH, Derivatively on Behalf of HANOVER COMPRESSOR COMPANY, | § | Civil Action No. **H- 02-1332** |
| Plaintiff, | § | |
| vs. | § | |
| MICHAEL A. O'CONNOR, WILLIAM S. GOLDBERG, MELVYN N. KLEIN, MICHAEL J. MCGHAN, TED COLLINS, JR., ROBERT R. FURGASON, RENE J. HUCK, ALVIN V. SHOEMAKER, VICTOR E. GRIJALVA, GORDON T. HALL and I. JON BRUMLEY, | § | |
| Defendants, | § | |
| - and - | § | |
| HANOVER COMPRESSOR COMPANY, a Delaware corporation, | § | |
| Nominal Defendant. | § | <u>DEMAND FOR JURY TRIAL</u> |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



EXHIBIT
B

Plaintiff, by his counsel, submits this Verified Shareholder Derivative Complaint against defendants herein. All allegations made in this Complaint are based on information and belief, except those allegations that pertain to the named plaintiff and his counsel which are based on personal knowledge. Plaintiff's verified information and belief is based, *inter alia*, on the investigation made by and through his counsel.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by a shareholder of Hanover Compressor Company ("Hanover" or the "Company"), on behalf of the Company against certain of its directors and officers seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, abuse of control, and gross mismanagement. This action results from defendants causing Hanover to issue improper financial statements and other false and misleading statements about the Company's operating performance between November 2000 and March 2002 (the "Relevant Period") as demonstrated by the Company's recent restatement of its fiscal 2000 and Q1, Q2 and Q3 2001 earnings.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

3. Plaintiff brings this action on behalf of Hanover pursuant to Rule 23.1 of the Federal Rules of Civil Procedure based on principles of state law which prohibit breach of the federal securities laws by officers and directors of public corporations, breach of the fiduciary duty of corporate candor by corporate fiduciaries, and the misappropriation of corporate information which was not available to the public investors at the time when certain individual defendants sold their Hanover stock at artificially inflated prices prior to the disclosure of the true state of business and operations of the Company. This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

4.      Venue is proper in this District pursuant to 28 U.S.C. §1391(a). Many of the acts and conduct constituting the violations of law complained of have occurred in this District. In addition, Hanover maintains its principal executive offices within this District.

## SUMMARY OF THE ACTION

5.      Nominal defendant Hanover began operating in 1990 and is headquartered in Houston, Texas. Hanover is a provider of natural gas compression, gas handling and related services in the United States and select international markets. The defendants caused Hanover to sell (issue) millions of shares of Hanover stock at grossly inflated prices, thus allowing the individual defendants and Hanover to benefit from the defendants' wrongful course of conduct. Hanover completed a secondary share offering that closed on March 16, 2001 at a price of $35.15. In that offering, insiders sold 7.5 million shares and the Company sold 2.5 million. In addition, during the Relevant Period the Company sold $170 million of convertible senior notes at a conversion price of $43.94. The director defendants each signed the false prospectus for that offering.

6.      During the Relevant Period, the defendants caused Hanover to inflate the price of the Company's stock in order to pursue an accelerated securities sales program. Defendants knew that concealing and failing to disclose Hanover's Hampton Roads joint venture and the true impact it would have on the Company provided the only way that they could foster the perception in the business community that Hanover was a "growth company," *i.e.,* the only way Hanover could post the revenue and earnings per share ("EPS") growth claimed by defendants. Furthermore, defendants have acknowledged the falsity of their prior earnings by restating Hanover's fiscal 2000 and Q1, Q2 and Q3 2001 earnings.

## THE PARTIES

7.      Plaintiff Roger Koch ("Koch") is, and was at times relevant hereto, an owner and holder of Hanover common stock. Koch is a citizen of California.

8.      Nominal defendant Hanover is a corporation organized and existing under the laws of the State of Delaware with its principal executive offices located at 12001 North Houston Rosslyn, Houston, Texas 77086. Hanover shares trade in efficient markets on the New York Stock Exchange.

9.　　(a)　　Defendant Michael A. O'Connor ("O'Connor") was, at all times relevant to the allegations raised herein, Chairman of the Board of Directors (the "Board") of Hanover. He was replaced as Chairman in or about March 2002, but remains a director. During the Relevant Period, while in possession of confidential information about Hanover's business, O'Connor improperly sold more than 150,000 shares of his privately held Hanover shares at a price of $35.15 per share, to realize illicit gross proceeds of over *$5.2 million*. O'Connor is believed to be a citizen of Texas.

　　　　(b)　　Defendant William S. Goldberg ("Goldberg") was, at all times relevant to the allegations raised herein, the Executive Vice President, CFO and a director of Hanover, as well as the managing director of GKH Partners, L.P., the General Partner of GKH Investments, L.P. (collectively, "GKH"). Goldberg was replaced as CFO and elected Vice Chairman of the Board on or about February 26, 2002. During the Relevant Period, while in possession of confidential information about Hanover's business, Goldberg improperly sold more than 4.9 million shares of Hanover stock at a price of $35.15 per share, to realize illicit gross proceeds of approximately *$172 million*. These sales were for shares owned by GKH, which is controlled by Goldberg.　Goldberg is believed to be a citizen of Texas.

　　　　(c)　　Defendant Melvyn N. Klein ("Klein") is, and at all times relevant to the allegations raised herein was, a director of Hanover. Klein is the sole stockholder of a corporation which is a general partner of GKH Partners, L.P., the General Partner of GKH Investments, L.P. During the Relevant Period, while in possession of confidential information about Hanover's business, Klein improperly sold more than 4.9 million shares of Hanover stock at a price of $35.15 per share, to realize illicit gross proceeds of approximately *$172 million*. These sales were for shares owned by GKH, which is controlled by Klein. Klein is believed to be a citizen of Texas.

　　　　(d)　　Defendant Michael J. McGhan ("McGhan") is, and at all times relevant to the allegations raised herein was, President, CEO and a director of Hanover. McGhan is believed to be a citizen of Texas.

　　　　(e)　　Defendant Ted Collins, Jr. ("Collins") is, and at all times relevant to the allegations raised herein was, a director of Hanover. Collin is believed to be a citizen of Texas.

(f)     Defendant Robert R. Furgason ("Furgason") is, and at all times relevant to the allegations raised herein was, a director of Hanover. Furgason is believed to be a citizen of Texas.

(g)     Defendant Rene J. Huck ("Huck") is, and since 2001 was, a director of Hanover. Huck is believed to be a citizen of Texas.

(h)     Defendant Alvin V. Shoemaker ("Shoemaker") is, and at all times relevant to the allegations raised herein was, a director of Hanover. Shoemaker is believed to be a citizen of New Jersey.

(i)     Defendant Victor E. Grijalva ("Grijalva") is Chairman of the Board of Hanover. Grijalva is believed to be a citizen of New York.

(j)     Defendant Gordon T. Hall ("Hall") is, and at times relevant to the allegations raised herein, was a director of Hanover. Hall is believed to be a citizen of Texas.

(k)     Defendant I. Jon Brumley ("Brumley") is, and at times relevant to the allegations raised herein, was a director of Hanover. Brumley is believed to be a citizen of Texas.

(l)     The defendants identified in ¶9(a)-(k) are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

10.     By reason of their positions as officers, directors, and/or fiduciaries of Hanover and because of their ability to control the business and corporate affairs of Hanover, the Individual Defendants owed Hanover and its shareholders fiduciary obligations of trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage Hanover in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Hanover and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

11.     Each director and officer of the Company owes to Hanover and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the

Company's operations, performance, services, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

12.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Hanover, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Hanover, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper revenue recognition of Hanover.

13.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Hanover, and was at all times acting within the course and scope of such agency.

14.     To discharge their duties, the officers and directors of Hanover were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Hanover were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's earnings and revenues and to ensure that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how Hanover conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable

inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

       (e)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public; and

       (f)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

    15.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Hanover, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders which the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Hanover's Board during the Relevant Period.

    16.    The Individual Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent its financial condition by issuing improper and false financial statements and other false and misleading statements about the Company's operating performance, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits which allege violations of federal securities laws. As a result, Hanover has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

       (a)    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)     Costs incurred in investigating and defending Hanover and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

17.     Moreover, these actions have irreparably damaged Hanover's corporate image and goodwill. For at least the foreseeable future, Hanover will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Hanover's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

18.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

19.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was issuing improper and false financial statements and other false and misleading statements about the Company's operating performance, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Hanover and the profits, power and prestige which the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Hanover, regarding the Individual Defendants' management of Hanover's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's revenues and earnings which had been falsified by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

20.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct commencing by at least November 2000 and continuing thereafter.

During this time the Individual Defendants caused the Company to conceal the true fact that Hanover was improperly recognizing revenues from the Hampton Roads fabrication project, that defendants had reported false revenue and earnings figures, as well as conceal other relevant facts. In addition, defendants also made other specific, false statements about Hanover's financial performance and future business prospects, as alleged herein.

21.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, abuse of control, and gross mismanagement; to conceal adverse information concerning the Company's operations, financial condition, and future business prospects; and to artificially inflate the price of Hanover common stock so they could: (i) foster the perception in the business community that Hanover was a "growth company," and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

22.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to (i) purposefully, recklessly or negligently overstate earnings and revenue, and (ii) report false revenues and earnings in violation of the Company's stated revenue recognition policies for the Company's entire fiscal 2000 and Q1, Q2 and Q3 of 2001. Because the actions described herein occurred under the authority of the Board of Directors, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

23.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

24.     Hanover's September 30, 2000 10-Q mentions several transactions. However, it conceals one transaction that actually took place in September, but was not reported in September.

This deal was a 25% investment in a limited partnership called "Hampton Roads."[1] Hampton Roads is a joint venture whose purported purpose was to build and operate a facility in Nigeria. Hanover agreed to invest $1.25 million in the deal.

25.     However, the "real" purpose of Hampton Roads was to provide a meaningful boost to Hanover's reported earnings in the September and December 2000 quarters and beyond. Potentially, the deal was worth $51 million in revenue to Hanover. That is a significant amount of revenue and would generate significant earnings. Defendants' goal was for all of the revenue to have been recognized by Hanover before the end of Q3:01, but they needed to recognize a significant amount in Q3:00 and Q4:00.

26.     The reason that the Q3:00 and Q4:00 quarters are so important is that Hanover completed a secondary share offering that closed on March 16, 2001, at a price of $35.15. In that offering insiders sold 7.5 million shares and the Company sold 2.5 million. In addition, the Company sold $170 million of convertible senior notes at a conversion price of $43.94.

**The Sham Transaction**

27.     In March 1998, a Nigerian company, GERL, entered into an agreement with Shell to buy gas from Shell in Nigeria. GERL was obligated as part of the deal to build and operate a gas processing plant on three barges to be located near Cawthorne Channel in Nigeria. In July 1999, the Individual Defendants caused Hanover to enter into an agreement with GERL to build the barges. In April 2000, a Houston energy broker, who is now an employee of Hanover, approached a local wealthy individual with a business proposition. The investor could receive at least a guaranteed 20% return on his investment for 10 years.

28.     Defendants worked at completing the deal in the summer of 2000, but toward the end of Q3:00, the defendants were scrambling to obtain signatures of all the relevant parties by September 30, 2000, so that their scheme to inflate the Company's results and complete the share and convertible note sales could succeed. The documents consisted of a *partnership member*

---

[1] The first and only mention of this deal that can be found in the public filings of Hanover is in the Fiscal 2000 10-K that was issued on *April 2, 2001*.

*agreement, a turnkey construction agreement with Hanover Maintech, a security agreement, a financing statement, and a guarantee of refund by Hanover.*

29.     The potential investor in Hampton Roads was advised to record the transaction in the Company's Q3:00, as the deal needed to be done by September 30, 2000, so that the Company could book revenue. In fact, it appears that the need to finish the deal was so urgent that the Individual Defendants caused Hanover to agree to pay the investor an additional inducement of a $1 million commission if the deal got done promptly. In addition, the Individual Defendants caused Hanover to also give the investor a *side letter* saying that it would loan up to approximately $40 million to the joint venture in the event the joint venture could not line up the additional financing necessary to pay the partnership's obligations to Hanover Maintech.

30.     The deal was signed on the weekend of September 30, 2000. The investor was to own 75% of the Hampton Roads joint venture, and Hanover 25%. Hanover agreed to pay the investor a $1 million fee to close the deal. The partnership provided a "Notice to Proceed" to the contractor, Hanover Maintech, on September 30, 2000.

**Terms of the Sham Transaction**

31.     Hanover would build and operate a natural gas processing plant built on three barges that would be operational in Nigeria by August 2001. The Individual Defendants caused Hanover to represent that the partnership would enter into a lease agreement which would provide to the partnership $1.1 million per month for a ten-year period, which was to be split 25% to Hanover and 75% to the investor, and at the end of the lease the barges were expected to be sold for $51 million or more, with the split again 25%/75%, except that over $60 million the split was 50%/50%. The investor expected to receive pre-tax net income of about $550,000 from this deal every month for a ten-year period after the barge was put into production. Hanover agreed to arrange to guarantee these payments. Thus, the investor expected a pre-tax return of $66 million over a 10-year period, guaranteed, on a net investment of $2.75 million plus some expenses. In addition, he would receive proceeds from the sale of the barges at the end of the 10-year lease. This sounds as if it was too good to be true, and indeed it did not happen.

32.     Simultaneously with the partnership deal being signed on September 30, 2000, the partnership executed a "*Turnkey Construction Agreement*" with Hanover Maintech, which said that it was giving Hanover a $51 million order to construct and install the barges by August 31, 2001. The first payment, $5 million, was to be made in 30 days, and the balance to be paid later. The partnership agreed to give Hanover a $43.5 million promissory note to guarantee its obligations to Hanover. The Individual Defendants caused Hanover to guarantee Maintech's performance to the partnership.

33.     Also on September 30, 2000, the Individual Defendants caused Hanover to issue a loan commitment letter to the partnership which constituted

> Hanover's commitment to loan funds to Hampton ... for the purpose of paying Hanover Maintech.... The balance of the purchase price as evidenced by a certain Promissory Note to be executed by Hampton ... upon acceptance of the plant/barges as provided for in the Turnkey Construction Contract ... not to exceed $43,500,000 ...

in the event that Hampton could not itself line up the financing.

34.     Also on September 30, 2000, Hanover Maintech issued a letter agreeing to pay a $1 million commission on the Turnkey deal to Hampton Roads or to a designated nominee of Hampton. This payment was due within 10 days after Hampton made the $5 million down payment to Hanover Maintech.

35.     On November 6, 2000, the Individual Defendants caused Hanover to issue a "Guarantee of Refund" to Hampton. The guarantee of refund notes that Global Leasing entered into a charter for the barges to be provided by Hampton. Global Leasing was supposed to provide a performance guarantee with respect to its lease obligations acceptable to Hampton by September 1, 2001. In connection with Global's obligation, Travelers of Hartford had issued on October 27, 2000, a conditional letter of commitment to issue the guarantee by September 1, 2001. However, if the conditions in the conditional letter were not met, then Travelers would not issue the performance guarantee. The Guarantee of Refund from Hanover to Hampton provided that if the preconditions were not met and the guarantee was not issued by Travelers, then Hanover would refund to Hampton any payments and expenses that had been incurred in relation to the transaction with Hanover Maintech and that Hampton would be released from all its obligations to Hanover Maintech. The

guarantee to Hampton provided that if the performance bond had not been posted guaranteeing the lease deal by February 6, 2001, Hampton could demand and receive its money back from Hanover Maintech.

36.     In December 2000, the investor in Hampton learned of problems with the deal in Nigeria. The Individual Defendants caused Hanover to tell the investor that Shell Nigeria, which was to provide the feedstock to the natural gas plant in Nigeria, which would be making the lease payments to Hampton, was claiming that it could not provide the amount of gas necessary to support the size of the project. The investor flew to Nigeria, where the president of Shell Nigeria told him that the critical pipeline that was necessary to provide gas feedstock to the plant would not be in place until between October 2003 and October 2004. Moreover, according to the investor, he was told that October 2003 to October 2004 had always been the completion date, *and that defendants had been aware of this*. He further told the investor that Shell Nigeria was in a formal arbitration in London with Hanover and Global Nigeria about the size of the plant.

37.     On February 5, 2001, when the deadline for providing the surety bond arrived and no bond had been produced, the investor decided to ask for his money back under the refund agreement. *A letter requesting the refund was sent to Hanover on February 6, 2001.*

38.     *The Individual Defendants caused Hanover to delay the refund of the money until March 19, 2001, three days after Hanover and Hanover insiders sold 10 million shares to the public and the convertible bond offering had been priced.*

39.     *Hanover did deliver a refund of $4 million pursuant to the guarantee of refund agreement on March 19, 2001. However, the method that it chose to deliver the funds was curious indeed. The Individual Defendants caused Hanover to tell the investor that it would not refund the money directly to the investor. Instead, the Company wanted to refund the money to another company related to the investor. On March 19, 2001, the Individual Defendants caused Hanover to refund the $4 million to a related entity of the investor, and in return the investor's affiliated entity issued a promissory note to Hanover for $4 million, payable by May 18, 2001.*

40.     Of course, the note was never repaid and Hanover never made a demand that the note be repaid. Instead, on August 7, 2001, the note was cancelled. At the same time, on August 7, 2001,

the Individual Defendants caused Hanover to issue a letter to the investor's attorney that asked for an agreement from the investor that acknowledged that when Hanover made the $4 million loan to the investor's affiliated entity that the entity was acting as a nominee for Hampton, and it was understood that the funds were to be treated as a repurchase of the investor's membership interest in Hampton Roads. The language reads: "*notwithstanding the documentation*," and "*as such represents a return of capital.*" Also on August 7, 2001, the investor agreed to relinquish his interest in the partnership, but retained his rights respecting costs and expenses and claims owed him under the original agreement. It would not be until January 2002 that the truth concerning the Hampton Roads transaction would ever *begin* to emerge. As the truth began to trickle into the market, followed by the Company's admission on January 28, 2002 that it had booked millions in revenue/EPS associated with its dubious Hampton Roads project, Hanover's shares had plummeted to below $15.00 per share.

41. On February 26, 2002, the Individual Defendants caused Hanover to admit that the Company's financial statements for fiscal 2000 and Q1, Q2 and Q3 2001 were improper. In a March 28, 2002 press release, the Company restated its income for those periods and recorded additional adjustments for depreciation and amortization and property taxes for the nine months ended September 30, 2001.

**False and Misleading Statements During the Relevant Period**

42. On November 8, 2000, the Individual Defendants caused the Company to issue a press release entitled, "Hanover Compressor Reports Record Third Quarter Driven by Strong Growth Across All Business Segments; Year-Over-Year Quarterly Net Income Increases 48%; Year-Over-Year Quarterly Cash Flow Increases 60%." The press release stated in part:

> Hanover Compressor Company, a leading provider of outsourced natural gas compression services, today reported continued strong growth in revenue, cash flow and net income for the third quarter ended September 30, 2000.
>
> Total revenue for the third quarter 2000 was $162.6 million, representing an 86 percent increase over total revenue for the quarter ended September 30, 1999 of $87.3 million. Cash flow (income before income taxes, interest expense, leasing expense, distributions on mandatorily redeemable convertible preferred securities and depreciation and amortization) increased 60 percent in the third quarter of 2000 to $55.2 million or $0.77 per fully diluted share. Year earlier cash flow was $34.5 million or $0.56 per fully diluted share. Net income grew 48 percent to $15.4 million

or $0.23 per fully diluted share, compared with $10.4 million or $0.17 per fully diluted share for the third quarter of 1999.

Total revenues for the nine-month period ended September 30, 2000 were $370.2 million, compared with $227.8 million for the first nine months of 1999, an increase of 63 percent. Cash flow increased 47 percent to $139.4 million or $2.16 per fully diluted share, compared with cash flow of $94.8 million or $1.55 per fully diluted share. Net income grew 43 percent to $39.3 million or $0.61 per fully diluted share, compared with $27.5 million or $0.45 per fully diluted share for the nine months ended September 30, 1999. Per share results have been adjusted to reflect the 2-for-1 stock split of outstanding shares on June 13, 2000.

"Hanover's very strong growth in revenues, cash flow and earnings reflect the Company's outstanding execution of our five-part growth strategy as well as the continued industry-wide growth in outsourcing in this highly favorable operating environment," said Michael J. McGhan, president and chief executive officer. "Our company has continued to make substantial gains in the core compression and gas handling business through strong organic growth as well as the successful integration of Hanover's recent major acquisitions, PAMCO Services International and Dresser-Rand's Compression Services Division. At the same time, Hanover has very successfully expanded into related product and service markets such as outsourced gas treating, compression maintenance and gas measurement, among others, expanding Hanover's market reach and increasing its return on capital. Through these moves we are able to offer the broadest set of compression and gas handling solutions, adding more value to our customers and assisting them to achieve their own performance and growth goals," McGhan added.

Compression rental revenue for the quarter ended September 30, 2000, increased 33 percent to $66.3 million, compared with $50.0 million for the third quarter of 1999. Total compression horsepower was 2,098,000 at September 30 and fleet horsepower utilization averaged 93 percent during the quarter. This statistic includes the impact of Hanover's acquisition of PAMCO Services International and Dresser-Rand's Compression Services Division in July and September, respectively, whose combined fleet aggregates 375,000 horsepower and is presently operating at 85 percent horsepower utilization, compared with 76 percent at the time of those acquisitions. Hanover's parts, service and used equipment segment continued to experience the fastest rate of growth among Hanover's businesses, with total revenue of $28.7 million, up 132 percent from the same period a year earlier. Third quarter compressor fabrication revenues increased 88 percent to $31.0 million, reflecting an increase in both compression horsepower packaged as well as unit sales to third party customers. Production and processing equipment fabrication revenue was $32.8 million, up 324 percent from the year earlier period, reflecting both the strengthening of Hanover's oil and gas production equipment business and the contribution of the T.H. Russell Co. and Maloney Industries units of Applied Process Solutions, Inc., acquired by Hanover on June 5, 2000.

*"Looking ahead, management sees continued significant growth due to the increasing outsourcing trend among our rapidly expanding customer base, Hanover's continued expansion of new and highly-related business lines and further improvements in the performance of recently acquired companies," McGhan said. "Hanover's solid performance to date confirms our view that a period of accelerated growth in the compression and gas handling industries is underway. The current outlook for our industry is very favorable and Hanover, the market leader, is expanding its lead. Steady growth in demand has resulted in industry-wide improvement in fleet utilization as the outsourcing trend intensifies.*

*Hanover's strategies, organization and growth drivers are in place and the activity level throughout our company is very high, contributing to our very strong outlook."*

43. On March 9, 2001, the Individual Defendants caused the Company to issue a press release entitled, "Hanover Compressor Reports Record Results; Anticipates "Strong" Growth in 2001; 4th Quarter Cash Flow and Diluted Earnings Per Share Increase 80 Percent and 29 Percent, Respectively; Fully Diluted 4Q00 EPS $0.27 vs. $0.21." The press release stated in part:

> Hanover Compressor Company, a leading provider of outsourced natural gas compression services, today reported record revenues, cash flow and earnings per common share for both the fourth quarter and year ended December 31, 2000, continuing the Company's strong growth record.

> "We are very pleased with Hanover Compressor's 45 percent growth in net income and 57 percent growth in cash flow during 2000, supported by the continued strength of the compression outsourcing segment, the very favorable operating environment for the energy industry, and the success in several recent acquisitions," said Michael J. McGhan, President and Chief Executive Officer. "We also were highly successful in growing our geographic presence both domestically and overseas, and in expanding our product line, thereby extending Hanover's industry leadership position.

> "We continue to maintain our lead in the compression services business, and we have confidence in Hanover's strong growth in the years ahead. Hanover's leadership in compression enables our company to offer customers a total solution to their gas handling needs by extending our successful outsourcing model from compression to gas treating, process measurement and power generation. I'm pleased to report we are experiencing strength in all aspects of our outsourcing business in the U.S. and dynamic international markets. The genuine value we deliver to our customers drives the outstanding growth Hanover is experiencing. These factors, together with the success of recent acquisitions and other successful growth initiatives, drive our belief that Hanover will deliver strong growth in 2001."

> For the fourth quarter of 2000, total revenues increased 145 percent to $233.6 million from $95.4 million in the year-earlier period. Net income rose 50 percent to $19.4 million from $12.9 million. Diluted earnings per common share increased 29 percent to $0.27 from $0.21. For the full year 2000, total revenues increased 87 percent to $603.8 million from $323.2 million in the prior year. Net income rose 45 percent to $58.7 million from $40.4 million. Diluted earnings per common share increased 33 percent to $0.88 from $0.66.

> For the fourth quarter of 2000, the Company's cash flow (income before income taxes, interest expense, leasing expense, distributions on mandatorily redeemable convertible preferred securities and depreciation and amortization) increased 80 percent to $67.3 million from $37.3 million in the year-earlier period. For fiscal 2000, the same measure increased 57 percent to $206.7 million from $132.1 million.

> Hanover's record performance in 2000 was driven by its core compression rentals segment, which generated over 81 percent of the Company's consolidated cash flow. Compression rental revenues increased 35 percent from quarter to quarter and

32 percent year to year. Related compression parts and service segment revenues were up 478 percent quarter to quarter and 257 percent year to year as a result of increased marketing focus and expansion of business activities through recent acquisitions. Compressor fabrication revenues increased 115 percent quarter to quarter and 84 percent year to year.

Production and processing equipment fabrication increased 406 percent quarter to quarter and 216 percent year to year. Strong growth during 2001 is anticipated as the Company's diversified customer base increasingly fills its compression services requirements through outsourcing compression and accelerates its purchases of equipment in concert with expanding production budgets.

Rental fleet compression, including the acquisition of OEC Compression scheduled to close this month, totals 2.4 million horsepower, an increase of 65 percent over 1999, reflecting the impact of both acquisitions and continued organic growth in customer demand for outsourcing compression.

*Looking ahead, McGhan remarked, "Hanover's solid growth confirms our view that a period of strong growth in the compression and gas handling industries is underway. Our confidence is supported by the robust business environment that our customers and we are now experiencing. Hanover has delivered significant growth during all phases of the commodity price cycle, and the present exceptional business environment is extremely encouraging. Hanover's strategies, organization and growth drivers are in place and the activity level throughout our company is strong, thereby contributing to Hanover's strong outlook. This future growth will be the product not only of sound acquisitions, but also due to the strong internal growth Hanover sees as customers continue to outsource more and more of the gas compression and treatment process to total solution providers."*

44.     On March 16, 2001, the Individual Defendants caused the Company to issue a press release entitled, "Hanover Compressor Company Announces Pricing of Public Offering." The press release stated in part:

Hanover Compressor Company today announced the public offering of 10 million shares of common stock and $170 million convertible senior notes.

The initial public offering price will be $35.15 for 10 million shares of its common stock, 2.5 million of which are offered by Hanover and 7.5 million shares of which are offered by selling stockholders.

Hanover also will issue $170 million aggregate principal amount of 4.75% Convertible Senior Notes due 2008. The notes will mature on March 15, 2008 and are first subject to call on March 15, 2004. The notes will be convertible into shares of Hanover Compressor Company common stock at a conversion price of approximately $43.94 per share.

45.     On April 2, 2001, the Company filed its 10-K, which stated in part:

*The Company has no commitments or contingent liabilities which, in the judgment of management, would result in losses that would materially affect the Company's consolidated financial position, operating results or cash flows.*

46.    On May 9, 2001, the Individual Defendants caused the Company to issue a press release entitled, "Hanover Compressor Reports Record Revenue and Cash Flow for 1st Quarter; Year-Over-Year Cash Flow Increases 78%; Fully Diluted 1Q01 EPS $0.26 vs. $0.18." The press release stated in part:

> Hanover Compressor Company, a leading provider of outsourced natural gas compression services, today reported revenues increased 143 percent and cash flow increased 78 percent for the first quarter ended March 31, 2001, compared with the same quarter a year earlier.
>
> "Across the board, Hanover's operations turned in a very solid performance in the first quarter, reflecting strong growth across all product lines, outstanding field operations and the continued success of the corporate acquisitions we completed during the second half of last year," said Michael J. McGhan, President and Chief Executive Officer. "Our results display strong organic growth in our outsourcing businesses which now includes compression, gas treating, process measurement and power generation."
>
> "The trend toward outsourcing continues to be strong among natural gas producers, both domestically and overseas," McGhan said. "Hanover's compressor fleet utilization and efficiency are running at a very high rate as our Company performs at the highest level for our expanding customer base. Barring fundamental changes in the energy sector, we anticipate continued strong growth throughout the year."
>
> First quarter total revenues increased 143% to $219.8 million from $90.6 million for the quarter ended March 31, 2000. Cash flow (income before income taxes, interest expense, leasing expense, distributions on mandatorily redeemable convertible preferred securities and depreciation and amortization) increased 78% to $69.8 million from $39.2 million for the same quarter a year ago. First quarter net income of $18.6 million was 66% higher than the year earlier level of $11.2 million. Diluted earnings per common share were $0.26, a 44% increase over $0.18 per fully diluted share a year ago. Diluted earnings per share for the quarter were reduced by $0.02 as a result of non-cash charge attributable to the Company's implementation of Financial Accounting Standards Board (FASB) Statement 133, Accounting for Derivatives, relating to an interest rate swap held by the Company.

47.    On August 9, 2001, the Individual Defendants caused the Company to issue a press release entitled, "Hanover Compressor Reports Record Revenues, EBITDA and Net Income for Second Quarter 2001; Year-Over-Year Quarterly Cash Flow Increases 72%." The press release stated in part:

> Hanover Compressor, a leading provider of outsourced natural gas compression and treating services, today reported revenues increased 124.7 percent and cash flow increased by 71.6 percent for the second quarter ended June 30, 2001, compared with the same quarter a year earlier. Net income for the quarter increased 83.2 percent over the prior year period.