

United States Courts
Southern District of Texas
FILED

JAN 3 0 2004

Michael N. Milby, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PIRELLI ARMSTRONG TIRE CORPORATION RETIREE MEDICAL BENEFITS TRUST, et al., On Behalf of Themselves and All Others Similarly Situated, | § § § § § | Civil Action No. H-02-0410 **(Consolidated)** <u>CLASS ACTION</u> |
| Plaintiffs, | § § | |
| vs. | § § | |
| HANOVER COMPRESSOR COMPANY, et al., | § § § | |
| Defendants. | § § | |

**DECLARATION OF CHERYL WASHINGTON RE: A) MAILING OF NOTICE OF PENDENCY AND SETTLEMENT OF DERIVATIVE ACTIONS, AND B) PUBLICATION OF SUMMARY NOTICE**

141

I, CHERYL WASHINGTON, declare:

1.      I submit this declaration in order to provide the Court and the parties to the above-captioned litigation with information regarding the mailing of the Notice of Pendency and Settlement of Derivative Actions (the "Derivative Notice") and publication of the Summary Notice. I am over 21 years of age and am not a party to this action. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2.      I am employed by Gilardi & Co. LLC, located at 1115 Magnolia Avenue, Larkspur, California. Gilardi was retained as the Notice Administrator in this matter. I am in charge of all new mailings for the company. As part of my duties, I oversaw the notice services Gilardi provided in accordance with the Order Preliminarily Approving Derivative Settlement and Approving the Form and Manner of Notice (the "Order") that has been entered by the Court in this matter.

3.      Gilardi prepared the Derivative Notice, the Exhibit A thereto and Summary Notice in the form approved by the Order. Gilardi obtained name and address information regarding Hanover shareholders of record as of May 12, 2003 ("Hanover Shareholders") from Hanover's transfer agent records.

4.      True and correct copies of the Derivative Notice and Exhibit A are attached hereto as Exhibits A and B.

5.      Envelopes addressed to each Hanover Shareholder that contained the notice package (the Derivative Notice and Exhibit A thereto) were delivered to the United States Postal Service for mailing on December 10, 2003. Derivative Notice packages were mailed to approximately 722 Hanover Shareholders by first-class mail.

6.      In response to correspondence or inquiries from potential Hanover Shareholders and or nominees, we have caused to be mailed directly to potential Hanover Shareholders or delivered in

bulk to nominees an additional 5,462 derivative notice packages. As of this date, we have mailed a total of 6,184 Derivative Notice packages to such persons.

7.      On December 15, 2003, I caused the Summary Notice to be published in the national edition of *Investor's Business Daily* as supported by the declaration of publication attached hereto as Exhibit C.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and that this declaration was executed this 27th day of January, 2004, at Larkspur, California.

_____
CHERYL WASHINGTON

S:\Settlement\Hanover.set\EMAIL-PDF\Gilardi-2.doc

- 2 -

A

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| PIRELLI ARMSTRONG TIRE CORPORATION RETIREE MEDICAL BENEFITS TRUST, *et al.*, On Behalf of Themselves and All Others Similarly Situated, | § § § § § | Civil Action No. H-02-0410 (Consolidated) Hon. Vanessa D. Gilmore |
| Plaintiffs, | § § | CLASS ACTION |
| vs. | § § | |
| HANOVER COMPRESSOR COMPANY, *et al.*, | § § | |
| Defendants. | § | |

## NOTICE OF PENDENCY AND SETTLEMENT OF DERIVATIVE ACTIONS

TO:     ALL HOLDERS OF HANOVER COMPRESSOR COMPANY COMMON STOCK AS OF MAY 12, 2003.

PLEASE READ THIS NOTICE CAREFULLY AND COMPLETELY.  YOUR RIGHTS WILL BE AFFECTED.

THIS NOTICE RELATES TO A PROPOSED SETTLEMENT OF SHAREHOLDER DERIVATIVE ACTIONS AND CLAIMS ASSERTED THEREIN.  HOLDERS OF HANOVER COMMON STOCK AS OF MAY 12, 2003, ARE ENTITLED TO OBJECT, IF THEY DESIRE, TO THE SETTLEMENT OF THE DERIVATIVE CLAIMS AS DESCRIBED HEREIN.  IF THE COURT APPROVES THE DERIVATIVE SETTLEMENT, YOU WILL BE BARRED FROM PURSUING THE RELEASED DERIVATIVE CLAIMS.

PLEASE FIND THE DEFINITION OF CAPITALIZED TERMS IN THE SECTION OF THIS NOTICE ENTITLED "DEFINITIONS."

## PURPOSE OF THIS NOTICE

This Notice is given pursuant to Rule 23.1 of the Federal Rules of Civil Procedure and by an Order of the United States District Court for the Southern District of Texas.  The purpose of the Notice is to advise you that shareholder derivative proceedings are now pending in the Court relating to Hanover and that the parties thereto have reached a proposed settlement which would fully, finally and forever resolve these actions on the terms and conditions summarized in this Notice and that a Settlement Hearing will be held on February 6, 2004 at 2:30 p.m., before the Honorable Vanessa D. Gilmore, United States District Court for the Southern District of Texas, Houston Division, 515 Rusk Avenue, Houston, Texas 77002.

THIS IS NOT AN EXPRESSION OF ANY OPINION BY THE COURT AS TO THE MERITS OF ANY CLAIMS OR ANY DEFENSES ASSERTED BY ANY PARTY IN THE ACTION, OR THE FAIRNESS, REASONABLENESS OR ADEQUACY OF THE PROPOSED SETTLEMENT.

## DEFINITIONS

1.  "Consolidated Securities Action" means *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust, et al. v. Hanover Compressor Co., et al.*

2.  "Court" means the United States District Court, Southern District of Texas.

3.  "Derivative Actions" means *Harbor Finance Partners v. McGhan, et al.*, Case No. H-02-0761; *Koch v. O'Connor, et al.*, Case No. H-02-1332; *Carranza v. O'Connor, et al.*, Case No. H-02-1430; *Steves v. O'Connor, et al.*, Case No. H-02-1527; *Hensley v. McGann, et al.*, Case No. H-02-1430; and *Coffelt Family, LLC v. O'Connor, et al.*, No. CA 19410.

4.  "Derivative Settlement" means the agreement to settle the claims against the Settling Derivative Defendants in the Derivative Actions, as described in the Stipulation.

5.  "ERISA Actions" means *Kirkley v. Hanover Co., et al.*, Case No. H-03-1155, *Angleopoulos v. Hanover Compressor Co., et al.*, Case No. H-03-1064, and *Freeman v. Hanover Compressor Co., et al.*, Case No. H-03-1095.

6.  "Federal Derivative Actions" means the Derivative Actions with the exception of *Coffelt Family, LLC v. O'Connor, et al.*, No. CA 19410.

# EXHIBIT A

7.  "GKH" means GKH Partners, L.P., GKH Investments, L.P., GKH Private Limited, HGW Associates, L.P., DWL Lumber Corp. and JAKK Holding Corp.

8.  "Hanover" means Hanover Compressor Company, a Delaware corporation.

9.  "Hanover Common Stock" means the common stock, par value $.001 per share, of Hanover.

10.  "Hanover Securities" means Hanover Common Stock and any other Hanover equity or debt security or option related to the forgoing.

11.  "Hanover Shareholders" means all record owners of Hanover Common Stock as of May 12, 2003.

12.  "Notice" means this Notice of Pendency and Settlement of Derivative Actions.

13.  "Michael A. O'Connor" means Michael A. O'Connor and his heirs, assigns, legatees, and devisees, the Estate of Michael A. O'Connor, Deceased, and Karen L. O'Connor as the Independent Executrix of the Estate of Michael A. O'Connor, Deceased.

14.  "Order" means the order preliminarily approving the Derivative Settlement referred to in this Notice.

15.  "Order and Final Judgment" means an order and final judgment, in substantially the form attached to the Stipulation, dismissing the Derivative Actions on the merits and with prejudice.

16.  "Person" means a natural person, individual, corporation, partnership, limited partnership, limited liability partnership, limited liability company, association, joint venture, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, any business or legal entity, and any spouse, heir, legatee, executor, administrator, predecessor, successor, representative or assign of any of the foregoing.

17.  "PwC" means PricewaterhouseCoopers LLP.

18.  "Related Person" means with respect to any Person, such Person's present and former parent entities, subsidiaries (direct or indirect) and affiliates, and each of their respective present and former shareholders, general partners, limited partners, affiliates, divisions, joint ventures, partnerships, officers, directors, employees, agents, representatives, attorneys, insurers, excess insurers, experts, advisors, investment advisors, underwriters, fiduciaries, trustees, auditors, accountants, representatives, spouses and immediate family members, and the predecessors, heirs, legatees, successors, assigns, agents, executors, personal representatives, attorneys, advisors and administrators of any of them, and the predecessors, successors, and assigns of each of the foregoing, and any other Person in which any such Person has or had a controlling interest or which is or was related to or affiliated with such Person, and any trust of which such Person is the settlor or which is for the benefit of such Person or member(s) of his or her family; provided, however, that PricewaterhouseCoopers, LLP is excluded from this definition and shall not be deemed to be a Related Person of any party to the Derivative Settlement, the Securities Settlement, or the ERISA Settlement.

19.  "Released Derivative Claims" means any and all claims, rights and causes of action, whether based on federal, state, local, statutory or common law or any other law, rule or regulation, including, without limitation, unknown claims and claims under ERISA, Delaware statutory and common law, federal and state securities laws and claims under any law governing fiduciaries or the duties of fiduciaries, that have been, could have been, or in the future might be or could be asserted in any form and in any forum by Hanover Shareholders against any of the Released Derivative Parties on behalf of Hanover that exist, could have existed, or may arise in connection with or that relate to the transactions (including the registration of securities and any failure to deliver prospectuses), matters or occurrences, or representations, or omissions involved, set forth, referred to, or which related in any way to the facts or allegations contained in or which could have been contained in the Derivative Actions (including, but not limited to, breach of any duty owed to Hanover, including the duty of care, loyalty and good faith).

20.  "Related Persons" means, with respect to any Person, such Person's present and former parent entities, subsidiaries (direct or indirect) and affiliates, and each of their respective present and former shareholders, general partners, limited partners, affiliates, divisions, joint ventures, partnerships, officers, directors, employees, agents, representatives, attorneys, insurers, excess insurers, experts, advisors, investment advisors, underwriters, fiduciaries, trustees, auditors, accountants, representatives, spouses and immediate family members, and the predecessors, heirs, legatees, successors, assigns, agents, executors, devisees, personal representatives, attorneys, advisors and administrators of any of them, and the predecessors, successors, and assigns of each of the foregoing, and any other Person in which any such Person has or had a controlling interest or which is or was related to or affiliated with such Person, and any trust of which such Person is the settlor or which is for the benefit of such Person or member(s) of his or her family; provided, however, that PwC is excluded from this definition and shall not be deemed to be a Related

Person of any Settling Party.

21. "Released Derivative Parties" means the Settling Derivative Defendants, the Plan, GKH, and Schlumberger, and each of their respective Related Persons.

22. "Securities Actions" means *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust, et al. v. Hanover Compressor Co., et al.*, Case No. H-02-0410, *McBride v. Hanover Compressor Co.*, Case No. H-02-0431, *Koch v. Hanover Compressor Co.*, Case No. H-02-0441, *Schneider v. Hanover Compressor Co.*, Case No. H-02-0491, *Goldstein v. Hanover Compressor Co.*, Case No. H-02-0526, *Noyes v. Hanover Compressor Co.*, No. H-02-0574, *Rocha v. Hanover Compressor Co.*, Case No. 02-0594, *Peck v. Hanover Compressor Co.*, Case No. H-02-0627, *Mueller v. Hanover Compressor Co.*, Case No. H-02-0652, *Langhoff v. Hanover Compressor Co.*, Case No. H-02-0764, *Fox v. Hanover Compressor Co.*, Case No. H-02-0815, *Rosen v. Goldberg*, Case No. H-02-0959, *Detectives Endowment v. Hanover Compressor Co.*, Case No. H-02-1016, *Montag v. Hanover Compressor Co.*, Case No. H-02-1030, and *Anderson v. Hanover Compressor Co.*, Case No. H-02-2306.

23. "Securities Settlement" means the settlement of the Consolidated Securities Action on and subject to the terms and conditions set forth in the Stipulation.

24. "Settlement Hearing" means a hearing that will be held by the Court to consider whether the proposed Derivative Settlement should be approved by the Court as fair, reasonable and adequate, and whether the Order and Final Judgment should be entered.

25. "Settling Derivative Defendants" means Hanover (as a nominal defendant), Michael A. O'Connor, William S. Goldberg, Melvyn N. Klein, Michael J. McGhan, Ted Collins, Jr., Robert R. Furgason, Rene J. Huck, Alvin V. Shoemaker, Victor E. Grijalva, Gordon T. Hall, I. Jon Brumley and Charles D. Erwin.

26. "Settling Derivative Defendants' Counsel" means Katten, Muchin, Zavis & Rosenman, Dechert LLP, Beck, Redden & Secrest, Smyser, Kaplan & Veselka, LLP, Wright & Brown, LLP, Orgain Bell & Tucker, LLP, Skadden, Arps, Slate, Meagher & Flom, LLP, and Hughes Hubbard & Reed LLP.

27. "Settling Derivative Plaintiffs" means the plaintiffs who brought the Derivative Actions.

28. "Settling Derivative Parties" means Settling Derivative Plaintiffs and Settling Derivative Defendants.

29. "State Derivative Action" means *Coffelt Family, LLC v. O'Connor, et al.*, No. CA 19410.

30. "Stipulation" means the proposed Stipulation and Settlement, filed with the Court, which would settle the Derivative Actions.

31. "Unknown Claims" means, with respect to a Settling Derivative Party, any and all claims which such Settling Derivative Party does not know or suspect to exist in his, her or its favor at the time such Settling Derivative Party releases such claims which, if known by him, her or it, might or would have affected his, her or its decision not to object to such release.

## BACKGROUND OF THE DERIVATIVE LITIGATION

On or after April 10, 2002, the Federal Derivative Actions were filed in or removed to the Court on behalf of Hanover. On February 15, 2002, an additional derivative action, *Coffelt Family, LLC v. O'Connor, et al.*, No. CA 19410, was filed in Delaware Chancery Court on behalf of Hanover.

The Derivative Actions, which were filed by certain Hanover Shareholders on behalf of Hanover, alleged, among other things, that Hanover's directors breached their fiduciary duties to shareholders in connection with transactions which were restated by Hanover in 2002. By way of relief, the Derivative Actions sought, on behalf of Hanover, damages, interest and costs, including legal fees.

On August 19, 2002 and August 26, 2002, the Federal Derivative Actions were consolidated into the *Harbor Finance Partners* action (the "Consolidated Derivative Action"). By Order dated October 2, 2003 the Court consolidated the Consolidated Derivative Action into the Consolidated Securities Actions captioned above.

Class action litigation also was initiated by various parties alleging violations of the federal securities laws and the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), in connection with many of the same events that are the subject of the Derivative Actions. Counsel for plaintiffs in the Derivative Actions, along with counsel for the plaintiffs in the Consolidated Securities Actions and the ERISA Actions, have conducted and completed extensive research, discovery and investigation, including without limitation: (1) inspection and analysis of tens of thousands of pages of documents produced by Settling Derivative Defendants; (2) review of Hanover's public filings, press releases and other public statements; (3) interviews of numerous Hanover officers and employees; and (4) consultation with accounting and damages consultants.

Counsel for the plaintiffs in the Derivative Actions and Settling Derivative Defendants have reached an agreement to settle the Derivative Actions on terms that are summarized herein. Counsel for plaintiffs in the Derivative Actions have engaged in substantial arm's-length negotiations in an effort to resolve all claims that have been or could be asserted in the Derivative Actions, including conducting numerous meetings and conferences where the terms of the agreements detailed herein were extensively debated and negotiated. The proposed Derivative Settlement, along with separate settlements of the Consolidated Securities Action and the ERISA Actions, are before the Court for approval.

## TERMS OF THE DERIVATIVE SETTLEMENT

The Derivative Settlement calls for Hanover to adopt significant governance reforms intended to improve the responsiveness and accountability of the corporation's board of directors and officers to the interests of shareholders. Under the terms of the settlement, Hanover's board of directors will adopt resolutions or amendments to Hanover's By-Laws or Articles of Incorporation to ensure adherence to such corporate governance enhancements. These modifications include a process for the election of two new directors to Hanover's board, enhanced director independence, implementation of an internal audit function, enhanced insider trading controls, and improvements to Hanover's code of conduct. These enhancements are detailed in the Corporate Governance Term Sheet, which is attached to this Notice as Exhibit A. Furthermore, the Settling Derivative Plaintiffs, through Settling Derivative Plaintiffs' Counsel, were a substantial factor in obtaining at least $26.5 million from Hanover's insurance carriers to be used towards the settlements and the contribution of 2.5 million shares of Hanover stock from GKH to the settlements.

## PLAINTIFFS' COUNSEL'S POSITION CONCERNING SETTLEMENT

Counsel for plaintiffs in the Derivative Actions have carefully considered and evaluated, among other things, the interests of Hanover in resolving the Derivative Actions with as little disruption to the corporation's affairs as is consistent with securing relief for Hanover Shareholders, the relevant legal authorities and evidence to support the claims asserted against the Settling Derivative Defendants, the likelihood of prevailing on those claims, the Settling Derivative Defendants' respective abilities to pay any judgment, and the likely appeals and subsequent proceedings necessary if the Settling Derivative Plaintiffs were to prevail against the Settling Derivative Defendants. They have concluded that the proposed Derivative Settlement is fair, reasonable, adequate and in the overall best interests of Hanover and its stockholders.

## DEFENDANTS' POSITION CONCERNING SETTLEMENT

Settling Derivative Defendants have denied and continue to deny that they have liability as a result of any or all of the allegations contained in the Derivative Actions, and are entering into the Derivative Settlement in order to eliminate the burden, distraction, expense and uncertainty of further litigation, and to undertake structural improvements in corporate governance that may benefit the corporation's stockholders.

## ATTORNEYS' FEES AND EXPENSES OF SETTLING DERIVATIVE PLAINTIFFS' COUNSEL

Counsel for the Settling Derivative Plaintiffs have not received any payment for work in connection with the Derivative Actions, nor been reimbursed for out-of-pocket expenses. Settling Derivative Plaintiffs, through their counsel, participated in the settlement negotiations relating to the Derivative Actions and were a significant factor in obtaining contribution by Hanover's insurance carriers and GKH toward the settlements of the Securities and ERISA Actions as well as substantial corporate governance enhancements. Within three (3) business days after preliminary approval of the Derivative Settlement, Hanover shall pay seventy five thousand dollars ($75,000) to counsel for the plaintiffs in the derivative action, *Koch v. O'Connor, et al.*, as payment for providing the appropriate court-directed individual notice to the Hanover Shareholders entitled to receive such notice, as well as any other required or appropriate notice to be made by publication or otherwise. If the proposed Derivative Settlement is approved by the Court, counsel to the Settling Derivative Plaintiffs will be paid the sum of $700,000 (excluding the costs of notice) and 75,000 shares of Hanover Common Stock.

## SETTLEMENT RELEASES AND BAR ORDER

If the Court grants the order approving the proposed Derivative Settlement and dismisses the Federal Derivative Actions with prejudice, the order will contain a "release" and "bar order" (the State Derivative Action will be dismissed in the Court of Chancery for the State of Delaware in and for New Castle County). The "release" and "bar order" are set forth in the Stipulation on file with the Court but are generally summarized here. Released Derivative Parties and their Related Persons will be released from a broad range of claims by Hanover Shareholders and their Related Persons. The release applies to all claims, including Unknown Claims, and the Settling Derivative Parties, Settling Derivative Defendants' Counsel and counsel to the Settling Derivative Plaintiffs agree to waive the benefits of §1542 of the California Civil Code (and the benefits of any other law (including principles of common law) of any state or territory

4

or other jurisdiction of the United States or of any jurisdiction outside of the United States that is similar, comparable or equivalent to §1542 of the California Civil Code), which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

If the proposed Derivative Settlement is approved, Released Derivative Defendants and their Related Persons will also be protected from further liability in connection with other potential lawsuits relating to the claims being settled in the Derivative Actions.

If the proposed Derivative Settlement is approved by the Court, all Hanover Shareholders will automatically participate in the settlement benefits. All Hanover Shareholders likewise will be bound by the terms of the Derivative Settlement, and their ability to pursue claims individually will be eliminated.

## CONDITIONS TO SETTLEMENT

The Stipulation contains conditions, certain of which may be waived by Hanover, which must be satisfied for the parties to be required to complete the Derivative Settlement.

## SETTLEMENT HEARING AND ABILITY TO OBJECT TO THE SETTLEMENT

Hanover Shareholders who comply with the procedures set forth below for making an appearance (personally or through counsel) may be heard to the extent allowed by the Court regarding the fairness, reasonableness, and adequacy of the Derivative Settlement, or the application for an award of attorneys' fees and reimbursement of expenses. You are not required to retain your own counsel, but if you choose to do so it will be at your own expense. In no event shall any Person be heard in opposition to the settlement, or regarding application for an award of attorneys' fees by counsel to Derivative Plaintiffs, and in no event shall any paper or brief submitted by any such Person be accepted or considered by the Court, unless by January 23, 2004 such Person (A) files with the Clerk of the Court notice of such Person's intention to appear, showing proof that such Person is a Hanover Shareholder, including the number of shares of Hanover Common Stock held, and providing a statement that indicates the basis for such appearance, along with any documentation in support of any objection, and (B) simultaneously serves copies of such notice, proof, statement, and documentation, together with copies of any other papers or briefs such Person files with the Court, in person or by mail upon:

Kevin T. Abikoff
HUGHES HUBBARD & REED LLP
1775 I Street, N.W.
Washington, D.C. 20006-2401

Counsel for Hanover Compressor Company

| | | |
|---|---|---|
| Richard B. Brualdi | Paul T. Warner | Brian J. Robbins |
| THE BRUALDI LAW FIRM | REICH & BINSTOCK | ROBBINS UMEDA & FINK, LLP |
| 29 Broadway, Suite 1515 | 4265 San Felipe, Suite 1000 | 1010 Second Avenue, Suite 2360 |
| New York, New York 10006 | Houston, TX 77027 | San Diego, CA 92101 |
| Telephone: 212-952-0602 | Telephone: 713-622-7271 | Telephone: 619-525-3990 |
| Facsimile: 212-785-1618 | Facsimile: 713-623-8124 | Facsimile: 619-525-3991 |

Counsel for Settling Derivative Plaintiffs

## SPECIAL NOTICE FOR HANOVER STOCKHOLDERS WHO ALSO ARE MEMBERS OF THE CLASSES IN THE SECURITIES AND ERISA LITIGATIONS

In addition to the Derivative Settlement, Settling Derivative Defendants and others have also agreed to settle the Consolidated Securities and ERISA Actions. By Order dated December 5, 2003, the Court has scheduled a hearing to determine, among other things, whether those proposed settlements are fair, reasonable and adequate.

Hanover Shareholders receiving this Notice may also be eligible to participate in the Securities Settlement and/or the ERISA Settlement, and, if so, you will receive a notice describing your rights and obligations in connection with each proposed settlement.

## NOTICE TO BANKS, BROKERS OR OTHER NOMINEES

If you held Hanover Common Stock on May 12, 2003 as a nominee for the benefit of another, you are directed to

provide a copy of this Notice to the beneficial owner of the publicly traded securities, postmarked no later than ten (10) days after receipt of this Notice or to provide within ten (10) days of receipt of this Notice the names and addresses of such Persons to the Claims Administrator, in which case the beneficial owner will be sent a copy of the Notice. You may obtain reimbursement of your reasonable and actual out-of-pocket disbursements that would not have been made but for this request by submitting an itemized statement to: Hanover Derivative Litigation, c/o Gilardi & Co. LLC, P.O. Box 990, Corte Madera, CA 94976-0990, Telephone (800) 447-7657.

## FURTHER INFORMATION

Further information regarding the Derivative Actions and this Notice may be obtained by contacting counsel to the Settling Derivative Plaintiffs: Paul T. Warner, Esq., Reich & Binstock, 4265 San Felipe, Suite 1000, Houston, TX 77027, Telephone: 713/622-7271; Richard B. Brualdi, Esq., The Brualdi Law Firm, 29 Broadway, Suite 1515, New York, New York 10006, Telephone: 212/952-0602; or Brian J. Robbins, Esq., Robbins Umeda & Fink, LLP, 1010 Second Avenue, Suite 2360, San Diego, CA 92101, Telephone: 619/525-3990.

All inquiries regarding this Notice should be made in writing to: Hanover Derivative Litigation, c/o Gilardi & Co. LLC, P.O. Box 990, Corte Madera, CA 94976-0990, or by telephone (800) 447-7657.

The pleadings and other records of the Derivative Actions may be examined and copied at any time during regular office hours at the Office of the Clerk, United States District Court, Southern District of Texas, Houston Division, 515 Rusk Avenue, Houston, Texas 77002.

**Please Do Not Telephone The Court or The Clerk's Office Regarding This Notice.**

DATED: December 5, 2003

BY ORDER OF THE COURT
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

6

Corrected  uments as of December 15, 2003

**Exhibit A**

## HANOVER COMPRESSOR
## CORPORATE GOVERNANCE SETTLEMENT TERM SHEET

Within 30 days after the later of entry of an Order and Final Judgment approving the Securities Settlement or the Derivative Settlement, the Company's Board of Directors will adopt resolutions or amendments to the Company's By-Laws or Articles of Incorporation to ensure adherence to the following Corporate Governance Policies; provided, however, that with respect to any policy affecting the composition of the Board of Directors, the Company, at its sole election, may elect to make any required change through a vote of shareholders at the annual meeting following the next election of directors after the later of entry of an Order and Final Judgment approving the Securities Settlement or the Derivative Settlement; provided further that if any such election is not at least 45 days after the later of entry of an Order and Final Judgment approving the Securities Settlement or the Derivative Settlement, then such changes may be deferred until the next annual election of directors. The Company agrees that the governance provisions included herein will remain in effect for five years or such earlier time as there is a Change in Control of the Company (as defined in the Stipulation) provided, however, that any proposed guideline can be altered or removed if the Board, in good faith and upon the advice of counsel, and after consultation with Plaintiffs' settlement counsel, who agrees to act reasonably and in good faith, determines that such guideline conflicts with or is substantially redundant with any law, regulation or rule (including rules of the New York Stock Exchange or other exchange or quotation system on which the Company's stock is listed or traded (collectively, herein, "NYSE")), or conflicts with or is substantially redundant with any amendment to the Company's articles of incorporation approved by the Company's shareholders.

### I. Board of Directors

A. Director Independence:

1. Every director standing for election shall stand for a one-year term.

2. No person who has reached the age of 72 shall be eligible for election or re-election as a director of the Company.

3. At least a majority of the Board, including the Chairman of the Board, shall be "independent directors," as defined below; provided, however, that within 12 months two-thirds of the Board shall be "independent directors" as defined below.

4. To be deemed "independent" in any calendar year, a director would have to satisfy the following qualifications:

   (a) has not been employed as an elected officer of the Company or its subsidiaries (direct or indirect) or affiliates (defined for purposes of this settlement term sheet as any individual or business entity that owns at least 12.5% of the securities of the Company having ordinary voting power) within the last five calendar years;

   (b) has not received, during the current calendar year or any of the three immediately preceding calendar years, remuneration, directly or indirectly, other than *de minimis* remuneration, as a result of service as, or compensation paid to an entity affiliated with the director that serves as, (i) an advisor, consultant, or legal counsel to the Company or to a member of the Company's senior management; or (ii) a significant customer or supplier of the Company; provided, however, that any director who was a member of the Board on May 13, 2003 and within the last three years has retired from an entity that would otherwise fit the definition included in (i) or (ii) of this paragraph shall not be rendered non-independent by virtue of remuneration he or she received prior to joining the Board of the Company;

   (c) has no personal services contract(s) with the Company, or any member of the Company's senior management;

   (d) is not affiliated with a not-for-profit entity that receives significant contributions from the Company;

   (e) during the current calendar year or any of the three immediately preceding calendar years, has not had any business relationship with the Company for which the Company has been required to make disclosure under Regulation S-K of the SEC, other than for service as a director or for which relationship no more than *de minimis* remuneration was received in any one such year; provided, however, that the need to disclose any relationship that existed prior to a director joining the Board shall not in and of itself render the director non-independent;

   (f) is not employed by a public company at which an executive officer of the Company serves as a director;

   (g) has not had any of the relationships described in subsections (a)-(f) above, with any affiliate of the Company;

   (h) is not a member of the immediate family of any person described in subsections (a)-(g) above; and

   (i) a director is deemed to have received remuneration (other than remuneration as a director, including remuneration provided to a non-executive Chairman of the Board, Committee Chairman, or Lead

Director), directly or indirectly, if remuneration, other than *de minimis* remuneration, was paid by the Company, its subsidiaries (direct or indirect), or affiliates, to any entity in which the director has a beneficial ownership interest of five percent or more, or to an entity by which the director is employed or self-employed other than as a director. Remuneration is deemed *de minimis* remuneration if such remuneration is $60,000 or less in any calendar year, or if such remuneration is paid to an entity, it (i) did not for the calendar year exceed the lesser of $5 million, or five percent (5%) of the gross revenues of the entity; and (ii) did not directly result in a material increase in the compensation received by the director from that entity.

5. The Company shall adopt share ownership guidelines for its directors that are designed to align the interests of the Board with those of shareholders, taking into account that share ownership requirements must ensure that Board members have a sufficient stake in the Company to share in the financial fortunes of shareholders while also considering the appropriate financial planning and needs of individual directors. At least 50% of directors' annual fees shall be paid in stock, provided that this amount may be reduced by any restricted stock award granted to a director.

6. The Board shall hold an executive session at least twice each year at which employee directors are not present.

B. The Nominating Committee, the Compensation Committee and the Audit Committee of the Board of Directors shall each be composed entirely of independent directors.

C. The offices of Chairman of the Board and Chief Executive Officer shall be held by separate individuals; provided, however, that if in the future the Chairman of the Board is not independent then a Lead Director who is independent shall be chosen (as noted below) and under such circumstances the Chairman of the Board and Chief Executive Officer may be held by the same individual.

D. The Compensation Committee shall recommend for review by the Board annual and long-term performance goals for the Chief Executive Officer and evaluate his performance against such goals and other relevant factors such as the performance of the Company's peer companies.

E. During its consideration of the compensation of the Chief Executive Officer, the Compensation Committee shall meet in executive session, without the Chief Executive Officer.

F. The Board's Committees shall have standing authorization, on their own decision, to retain legal and/or other advisors of their choice, which advisors shall report directly to the Committees and whose reasonable fees and expenses shall be paid by the Company.

G. The Board of Directors shall adopt a resolution setting forth the following compensation principles:

1. Compensation arrangements shall emphasize pay for performance and encourage retention of those employees who enhance the Company's performance.
2. Compensation arrangements shall promote ownership of the Company stock to align the interests of management and stockholders.
3. Compensation arrangements shall maintain an appropriate balance between base salary and long-term and annual incentive compensation.
4. In approving compensation, the recent compensation history of the executive, including special or unusual compensation payments, shall be taken into consideration.
5. Cash incentive compensation plans for senior executives shall link pay to achievement of financial goals set in advance by the Compensation Committee.
6. The Nominating and Corporate Governance Committee shall review annually the compensation of directors.

H. The Board of Directors shall adopt a resolution broadening the mandate of the Nomination Committee to make it the Nominating and Corporate Governance Committee, which Committee's functions shall include:

1. The Nominating and Corporate Governance Committee, in consultation with the Chairman of the Board, the Lead Director (if the Lead Director is not also the Chairman of the Board) and the Chief Executive Officer, shall be responsible for periodic review and interpretation of the Company's Corporate Governance Policies and the Nominating and Corporate Governance Committee Guidelines, as well as consideration of other corporate governance issues that may, from time to time, merit consideration by the entire Board;
2. The Nominating and Corporate Governance Committee, in consultation with the Chairman of the Board, the Lead Director (if the Lead Director is not also the Chairman of the Board) and the Chief Executive Officer, shall consider and make recommendations to the Board concerning the appropriate size and needs of the Board.

3. The Nominating and Corporate Governance Committee, in consultation with the Chairman of the Board, the Lead Director (if the Lead Director is not also the Chairman of the Board) and the Chief Executive Officer, shall consider candidates to fill vacant Board positions. Candidates shall be selected for their character, judgment, business experience, time commitment, and acumen. Final approval of a candidate shall be determined by the full Board.

4. The Board shall establish performance criteria for itself and evaluate itself and individual members on a regular basis. Board evaluation shall include an assessment of whether the Board has the necessary diversity of skills, backgrounds, experiences, etc., to meet the Company's ongoing needs. Individual director evaluations shall include high standards for in-person attendance at Board and committee meetings and consideration of absences.

5. The Nominating and Corporate Governance Committee shall consider policies relating to the Board and directors, including committee structure and size, share ownership, and retirement and resignation.

I.  The Board shall designate an independent director to act in a lead capacity to coordinate the other independent directors, as described below. The Lead Director may also serve as Chairman of the Board. The Lead Independent Director is responsible for coordinating the activities of the independent directors. In addition to the duties of all Board members (which shall not be limited or diminished by the Lead Independent Director's role), the specific responsibilities of the Lead Independent Director are to advise the Chairman of the Board (if the Lead Director is not also the Chairman of the Board) or to undertake the following:

1. determine an appropriate schedule of Board meetings, seeking to ensure that the independent directors can perform their duties responsibly while not interfering with the flow of the Company's operations;

2. prepare agendas for the Board and Committee meetings;

3. assess the quality, quantity, and timeliness of the flow of information from the Company's management that is necessary for the independent directors to effectively and responsibly perform their duties, and although the Company's management is responsible for the preparation of materials for the Board, the Lead Independent Director may specifically request the inclusion of certain material;

4. direct the retention of consultants who report directly to the Board;

5. ensure that the Governance Committee oversees compliance with and implementation of the Corporate Governance Policies and ensures that the Chairman of the Governance Committee oversees the process to recommend revisions to the Corporate Governance Policies;

6. coordinate, develop the agenda for, and moderate executive sessions of the Board's independent directors, and act as principal liaison between the independent directors and the Chairman of the Board and/or Chief Executive Officer on sensitive issues;

7. evaluate, along with the members of the Compensation Committee and the full Board, the Chief Executive Officer's performance and meet with the Chief Executive Officer to discuss the Board's evaluation; and

8. recommend the membership of the various Board Committees, as well as selection of the Committee Chairs.

J.  The Lead Independent Director shall have the authority to retain such counsel or consultants as the Lead Independent Director deems necessary to perform his or her responsibilities whose reasonable fees and expenses shall be paid by the Company.

K.  At each regularly scheduled Board of Directors meeting, the Company's Chief Financial Officer or his designee shall provide a report that includes year-to-date financial results and quarterly or quarter-to-date financial results that include the Company's financial condition and prospects, including but not limited to, as appropriate under the circumstances, a discussion of all reasons for material increases in expenses and liabilities, if any, and material decreases in revenues and earnings, if any, including any modification or adjustment of reserve accounts or contingencies and management plans for ameliorating or reversing such negative trends and the success or failure of any such plans presented in the past.

## II. Shareholder Nominated Directors

A.  The Board through its bylaws or otherwise shall establish a procedure for shareholders to nominate one or two directors as detailed below.

1. Initial Review Process. As soon as reasonably practicable after the execution of a Memorandum of Understanding attaching as an exhibit this Corporate Governance Term Sheet, Lead Plaintiffs' Counsel (or their designee), in coordination with the Chairman of the Board of Hanover (or his designee) shall seek to identify potential directors. In undertaking this process, Lead Plaintiffs' Counsel (or their designee), in coordination with the Chairman of the Board of Hanover (or his designee) shall contact each individual or entity holding more than 1% (but less than 10%) of the Company's common stock for the purpose of requesting that such shareholder or shareholders provide the name or names of candidates for Hanover's Board of Directors. Lead Plaintiffs' Counsel, in coordination with the Chairman of the Board, shall conduct an

appropriate review (including background information and interviews of prospective candidates) and submit the names of the individuals determined to be qualified (as measured against criteria to be established by Hanover's Board of Directors in the exercise of their business judgment) to the Nomination and Corporate Governance Committee for review.

2. <u>Initial Selection Process</u>. Hanover's Nominating and Corporate Governance Committee shall review each of the candidates submitted to it by Lead Plaintiffs' Counsel and select from among them the two determined by the Committee in the exercise of its business judgment as the most appropriate for being added to Hanover's Board. In the event that two are not selected from those presented to the Nominating and Corporate Governance Committee, Lead Plaintiffs' Counsel shall be advised of this determination, including the reasons for it, and shall be given an opportunity (utilizing the process noted above) to continue to submit qualified candidates until two candidates are identified. Once two candidates are identified, the Nominating and Corporate Governance Committee shall recommend to the Board, and the Board shall, subject to its fiduciary duties, elect the two candidates.

3. <u>Vacancies Among Selected Directors</u>. Should either or both of the directors selected pursuant to paragraphs (1) and (2) hereof cease to be on the Board because of death, resignation, disability or removal, Lead Plaintiffs' Counsel shall have the right to initiate and participate in the selection of a replacement director or directors following the procedure set forth in paragraphs (1) and (2) above.

4. <u>Additional Term of Selected Directors</u>. After their initial election to the Board, the two shareholder nominated directors shall be nominated by the Board at the next annual election at which directors are elected to serve for an additional one year term; provided, however, that in the event either or both of such directors die, resign, or are disabled or removed, or if the Board determines reasonably and in good faith that they should not be nominated, then Lead Plaintiffs' Counsel shall have the right to initiate and participate in the selection of a replacement director or directors following the procedure set forth in paragraphs (1) and (2) above.

5. <u>Continued Election of Single Shareholder Nominated Director</u>. After the election of the two shareholder nominated directors as specified in paragraph (4) above, who shall serve for a term of one year, at the next annual election of directors, the Board, subject to its fiduciary duties, shall only be obligated to nominate, in its sole discretion, one shareholder nominated director, provided, however, that nothing herein will prevent the Board from nominating both shareholder nominated directors; provided, further that in the event either or both of such directors die, resign, or are disabled or removed, or if the Board determines reasonably and in good faith that they should not be nominated, then Lead Plaintiffs' Counsel shall have the right to initiate and participate in the selection of a replacement director or directors following the procedure set forth in paragraphs (1) and (2) above.

## III. Internal Audit Function

Within six months of final approval of the settlement, the Company shall implement an intensive internal audit function. The Internal Auditor, who shall be appointed by the Board and who will report to the Audit Committee at least twice a year, shall monitor the Company's internal control environment, revenue recognition practices and its accounting practices. The Internal Auditor shall be responsible for devising an Internal Audit Plan for each fiscal year which will be presented to the Audit Committee of the Board of Directors. The Internal Audit Plan shall include assessment of the internal controls environment in order to ensure that appropriate financial reporting procedures are in place and being followed by the Company's employees. Appropriate Company operations as dictated by the Internal Audit Plan shall be subject to an internal audit review each year. A written report shall be prepared for each internal audit performed describing the internal audit's findings, opinions and recommendations, if any. As appropriate, after review and comment from potentially impacted operational departments, these written reports (together with any response from potentially affected departments) shall be directed to the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, General Counsel, and the Audit Committee for their review, and, if necessary, remedial action.

## IV. Revenue Recognition Policy

A. The Chief Executive Officer and Chief Financial Officer shall be responsible for ensuring that the Company's revenue recognition policy conforms to the requirements of Generally Accepted Accounting Principles ("GAAP"), as currently in effect or as amended, and is implemented and utilized throughout the Company. The Chief Executive Officer and Chief Financial Officer shall report to the Board of Directors or the Audit Committee on a semi-annual basis regarding the implementation and operation of this policy. The Chief Executive Officer and Chief Financial Officer shall ensure that the Company revenue recognition policy is distributed to each Company employee who records or reviews the recording of revenue. Any questions regarding that policy, or its

application, shall be directed to the Company's Chief Financial Officer, who shall, as appropriate, inform the Chief Executive Officer.

B.  To the extent net income was benefited in the aggregate for a quarter by the modification or adjustment of any reserve or contingency amounts, of more than the one percent of quarterly revenue such modification or adjustment shall be clearly disclosed in the quarterly statements.

## V.  Stock Options

Subject to the adoption of guidelines by the FASB and compliance with any such guidelines, the Company will either fully expense all stock options going forward or shall provided sufficient disclosure in its periodic reports to allow shareholders to determine the expense impact of granted options.

## VI.  Annual Audit of Financial Statements by Independent Auditor

A.  So long as the Company remains a publicly traded company, the Company shall engage an independent auditing firm to perform an annual audit of its financial statements.  The annual audit will encompass, as determined appropriate by the Chief Financial Officer and such independent auditing firm, a review of the financial results reported by each Company office to the Company headquarters.  A written report of the results of each annual audit, including any findings, opinions or recommendations by the independent auditor shall be provided to the Chief Executive Officer, the Chief Operating Officer, the Chief Financial Officer and the Audit Committee of the Board of Directors for review and remedial action, if necessary.

B.  The Company's independent auditing firm may not perform any consulting work for the Company, other than tax consulting work.

C.  The Company shall rotate its independent auditing firm on or before March 1, 2008.

## VII.  Insider Trading Controls

A.  The Board of Directors will appoint an officer of the Company who will be responsible for effecting compliance with the Company's stock trading and market communications policy.  That individual will be designated the "Trading Compliance Officer," and will be responsible for developing (with Board involvement), presenting to the Board for approval, and monitoring and updating (with Board involvement and approval) a comprehensive program (the "Trading Compliance Program") designed to ensure compliance with the Company's trading policies.  The Board will be responsible for direct oversight of the Trading Compliance Program and the Trading Compliance Officer, and the outside director (non-management) members of the Board will have direct access to the Trading Compliance Officer, including the opportunity to meet with the Trading Compliance Officer outside the presence of any other member of management.  At least once yearly, the outside director members of the Board will receive a report from the Trading Compliance Officer outside the presence of any other members of management.

B.  The Trading Compliance Program shall contain provisions with respect to transactions in the Company's securities by directors and officers of the Company which are no less restrictive than those set forth in the New York Stock Exchange Listed Company Manual and shall take into account applicable federal securities laws and regulations.

C.  During the pendency of any Company-funded open market stock buy-back program, no insider shall be permitted to sell stock.

D.  Any corporate director or elected officer who acquires Company shares via option exercise, of options granted after Settlement Approval, must retain 33% of the net shares acquired, after taking into account the sale of shares to pay taxes and the option exercise price, for at least 12 months or such earlier time as the individual ceases to be a director of or an executive officer of the Company as a result of death, resignation, termination or other reason.

E.  The Company shall require the public disclosure of all sales or purchases of the Company's stock by any corporate executive officers or directors within 48 hours of such purchase or sale.  Using Company stock or options to secure any loan to an executive officer or director or engaging in a swap, forward contract or other similar contract involving an executive officer's or director's stock shall be considered a "sale" and so disclosed. The Company will take reasonable steps to ensure that all directors and officers file all trading forms required by them to be filed by the SEC concerning trading by directors, officers, and executive employees of the Company.

F.  Failure to comply with the Company's trading policy will result in appropriate sanctions, including disgorgement by the individual to the Company of all profits from the transaction, termination, or other appropriate disciplinary action.

G. No corporate officer or director shall directly or indirectly "short" the Company's stock or engage in "put" or "call" transactions involving the Company's stock.

### VIII. Stock Options/Change-of-Control

A. No stock option plan for corporate executives or directors may be adopted without a shareholder vote. Previously established stock option plans may not be modified to reduce stock option exercise prices or increase the number of shares available under the plan without a shareholder vote.

B. No corporate executive compensation plan adopted after the date of the final approval of the settlement may include any "change-of-control" definition that does not require the actual sale or merger of the Company to trigger a "change-of-control." A vote in favor of a merger or sale of the Company shall not constitute a "change-of-control." Provided, however, that any executive compensation plan may continue to define change of control broadly to include, among other things instances where (i) the Company sells, leases or exchanges all or substantially all of its assets to any other person or entity (other than to an entity wholly owned, directly or indirectly, by the Company), (ii) there is consummated a merger, consolidation, re-capitalization, reorganization or other similar transaction involving the Company, other than one in which more than 50% of the total voting power of the surviving entity outstanding immediately after such transaction is beneficially owned by the holders of the outstanding voting securities of the Company immediately prior to such transaction, with the voting power of each such continuing holder relative to other such continuing holders not substantially altered in the transaction, (iii) the Company is to be dissolved and liquidated, (iv) any person or entity, including a "group" as contemplated by Section 13(d)(3) of the Securities Exchange Act of 1934, acquires or gains ownership or control (including, without limitation, power to vote) of more than 50% of the outstanding shares of the Company's voting stock (based upon voting power).

### IX. Code of Conduct

The Company shall create, maintain and disseminate to employees a code of conduct appropriate in scope and content which shall include, among other things, policies with respect to insider trading and proper documentation and accounting of transactions.



**Affidavit of Publication**

Name of Publication:      Investor's Business Daily
Address:                    12655 Beatrice Street
City, State, Zip:           Los Angeles, CA 90066
Phone #:                  310.448.6700
State of:                  California
County of:              Los Angeles

       I, Betsy Fuller, for the publisher of Investor's Business Daily, published in the city of Los Angeles, state of California, county of Los Angeles hereby certify that the attached notice was printed in said publication on the following date(s):

       December 15, 2003

       Given under my hand, this 15th day of December, 2003.

Signature _____

Sworn to and subscribed before me this ___15th___ day of __December__,

200_3_, by Betsy Fuller at __los Angeles__,

state of __California__,

county of __los Angeles__.

Notary Public: __Heather O'Connor__

My commission expires: ___4/28/04___

Seal:

HEATHER O'CONNOR
Commission # 1262101
Notary Public - California
Los Angeles County
My Comm. Expires Apr 28, 2004

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

PIRELLI ARMSTRONG TIRE          §   Civil Action No.
CORPORATION RETIREE             §   H-02-0410
MEDICAL BENEFITS TRUST, et al.  §   (Consolidated)
On Behalf of Themselves and All §   Hon. Vanessa D. Gilmore
Others Similarly Situated       §
                                §
            Plaintiffs,         §   CLASS ACTION
                                §
    vs.                         §
                                §
HANOVER COMPRESSOR              §
COMPANY, et al.,                §
                                §
            Defendants.         §

NOTICE OF PENDENCY AND SETTLEMENT OF DERIVATIVE
ACTIONS

TO: ALL HOLDERS OF THE COMMON STOCK OF HANOVER
COMPRESSOR COMPANY AS OF MAY 12, 2003

    You are hereby notified that a settlement has been proposed in the shareholder derivative actions consolidated with the above-captioned action. A Settlement Hearing will be held on February 6, 2004, at 2:30 p.m., before the Honorable Vanessa D. Gilmore, United States District Court for the Southern District of Texas, Houston Division, 515 Rusk Avenue, Houston, Texas 77002 to consider (i) the fairness, reasonableness and adequacy of the Settlement, and (ii) whether an Order and Final Judgment should be entered dismissing the actions with prejudice.

    IF YOU ARE A HANOVER SHAREHOLDER, YOUR RIGHTS WILL BE AFFECTED. If you have not yet received the printed Notice of Pendency and Settlement of Derivative Actions, you may obtain a copy by identifying yourself as a Hanover Shareholder and by contacting:

                    Hanover Derivative Litigation
                    c/o Gilardi & Co. LLC
                    P.O. Box 990
                    Corte Madera, CA 94976-0990
                    (800) 447-7657

Inquiries, other than requests for the forms of Notice, may be made to:

    Paul T. Warner                  Richard B. Brualdi
    REICH & BINSTOCK      Or        THE BRUALDI LAW FIRM
    4265 San Felipe, Suite 1000     29 Broadway, Suite 1515
    Houston, TX 77027               New York, New York 10006

    Or

    Brian J. Robbins
    ROBBINS UMEDA & FINK, LLP
    1010 Second Avenue, Suite 2360
    San Diego, CA 92101

    Please Do Not Telephone The Court or The Clerk's Office Regarding This Notice.

DATED: December 4, 2003    BY ORDER OF THE COURT
                            UNITED STATES DISTRICT COURT
                            SOUTHERN DISTRICT OF TEXAS

## DECLARATION OF SERVICE BY UPS DELIVERY

I, the undersigned, declare:

1.    That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 401 B Street, Suite 1700, San Diego, California 92101.

2.    That on January 30, 2004, declarant served by UPS, next day delivery, the DECLARATION OF CHERYL WASHINGTON RE: A) MAILING OF NOTICE OF PENDENCY OR ERISA CLASS ACTION SETTLEMENT, AND B) PUBLICATION OF SUMMARY NOTICE to the parties listed on the attached Service List.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 30th day of January, 2004, at San Diego, California.

_Danelle L McNertney_

DANELLE L. MCNERTNEY

HANOVER COMPRESSOR (SETTLEMENT)

Service List - 1/29/2004    (202-038S)

Page 1 of 3

## Counsel For Defendant(s)

Eric J.R. Nichols
Beck, Redden & Secrest L.L.P.
One Houston Center
1221 McKinney Street, Suite 4500
Houston, TX  77010
   713/951-3700
   713/951-3720 (Fax)


Harvey G. Brown, Jr.
Orgain, Bell & Tucker
27 Post Oak, Suite 1410
Houston, TX  77056
   713/572-8772
   713/572-8766 (Fax)

Pamela G. Smith
Katten, Muchin Zavis & Rosenman
525 W. Monroe Street, Suite 1600
Chicago, IL  60661-3693
   312/902-5200
   312/902-1061 (Fax)


Thomas W. Paterson
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX  77002-5096
   713/651-9366
   713/654-6666 (Fax)


## Counsel For Plaintiff(s)

George E. Barrett
Douglas S. Johnston, Jr.
Timothy L. Miles
Barrett, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
   615/244-2202
   615/252-3798 (Fax)


James G. Stranch III
Branstetter, Kilgore, Stranch & Jennings
227 Second Avenue, North, 4th Floor
Nashville, TN  37201-1631
   615/254-8801
   615/255-5419 (Fax)

James D. Baskin, III
Baskin Law Firm
300 W. 6th Street, Suite 1950
Austin, TX  78701
   512/381-6300
   512/322-9280 (Fax)


Timothy J. Crowley
Richard E. Norman
Crowley Douglas & Norman, LLP
1301 McKinney, Suite 3500
Houston, TX  77010
   713/651-1771
   713/651-1775 (Fax)

HANOVER COMPRESSOR (SETTLEMENT)
Service List - 1/29/2004   (202-038S)
Page 2 of 3

John G. Emerson, Jr.
Scott E. Poynter
Emerson Poynter LLP
1509 Louisiana, Suites C & D
Little Rock, AR  72202-5094
   501/907-2555
   501/907-2556 (Fax)

Darren J. Robbins
Jeffrey D. Light
Matthew P. Montgomery
Milberg Weiss Bershad Hynes & Lerach LLP
401 B Street, Suite 1700
San Diego, CA  92101-4297
   619/231-1058
   619/231-7423 (Fax)

Paul Warner
Reich & Binstock
4265 San Felipe, Suite 1000
Houston, TX  77027
   713/622-7271
   713/623-8724 (Fax)

Marc A. Topaz
Darren J. Check
Schiffrin & Barroway, LLP
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA  19004
   610/667-7706
   610/667-7056 (Fax)

Thomas E. Bilek
Hoeffner & Bilek, LLP
440 Louisiana, Suite 720
Houston, TX  77002
   713/227-7720
   713/227-9404 (Fax)

Joe Kendall
Provost Umphrey Law Firm, LLP
3232 McKinney Avenue, Suite 700
Dallas, TX  75204
   214/744-3000
   214/744-3015 (Fax)

Brian J. Robbins
Marc M. Umeda
Robbins Umeda & Fink, LLP
1010 Second Avenue, Suite 2360
San Diego, CA  92101
   619/525-3990
   619/525-3991 (Fax)

Robert C. Schubert
Schubert & Reed LLP
Two Embarcadero Center, Suite 1660
San Francisco, CA  94111
   415/788-4220
   415/788-0161 (Fax)

HANOVER COMPRESSOR (SETTLEMENT)

Service List - 1/29/2004    (202-038S)

Page 3 of 3

Roger B. Greenberg
Schwartz, Junell, Greenberg & Oathout, LLP
Two Houston Center
909 Fannin, Suite 2000
Houston, TX 77010
  713/752-0017
  713/752-0327 (Fax)

Richard B. Brualdi
Kevin T. O'Brien
The Brualdi Law Firm
29 Broadway, Suite 1515
New York, NY 10006
  212/952-0602
  212/952-0608 (Fax)